Filed 9/10/13  P. v. Trulove CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMAL R. TRULOVE,<br><br>    Defendant and Appellant. | A130481<br><br>(San Francisco County<br>Super. Ct. No. SCN208898) |

Defendant Jamal R. Trulove appeals from his conviction of first degree murder, accompanied by a sentence enhancement, and possession of a firearm by a felon, for which defendant was sentenced to 50 years to life imprisonment.

Defendant claims the judgment must be reversed for six categories of reasons. Specifically, he argues the trial court improperly denied his motion for a new trial based on newly discovered evidence; the trial court improperly denied his pretrial motion to dismiss the case based on the People's failure to provide certain discovery, which purportedly denied him his right to a fair preliminary hearing; the trial court did not give certain jury instructions sua sponte; the trial court improperly allowed the prosecution's key witness to testify about her fear of retaliation and her participation in the witness protection program; the prosecutor committed numerous acts of prejudicial misconduct in her closing argument; and the evidence was insufficient to support defendant's first degree murder conviction.  We have reviewed each of defendant's claims and conclude there is not a basis for reversal.

1

However, we conclude there is insufficient evidence of premeditation and deliberation to support a first degree murder conviction. Therefore, pursuant to Penal Code sections 1181, subdivision 6 and 1260,[1] we modify the judgment to reduce defendant's murder conviction from first to second degree and remand this matter to the trial court for resentencing. Otherwise, we affirm the judgment.

We affirm despite the disappointing failure of the People to address a number of defendant's arguments. Defendant argues that if the People have not addressed an argument he raises, we should take this silence as a concession that the argument cannot be rebutted, pursuant to *Gonzalez-Servin v. Ford Motor Co.* (7th Cir. 2011) 662 F.3d 931, 933-934. He repeatedly asserts this in his reply brief whenever he finds the People's responses deficient in addressing his arguments and case citations. We decline to do so. Although as a matter of sound practice the People certainly should respond to the arguments presented by defendant, we are mindful that "on appeal a judgment is presumed correct, and a party attacking the judgment, or any part of it, must affirmatively demonstrate prejudicial error." (*People v. Garza* (2005) 35 Cal.4th 866, 881.) We are controlled by this authority and, hence, have examined the persuasiveness of defendant's arguments throughout, regardless of whether the People have sufficiently responded to them or not.

## BACKGROUND

In June 2009, the San Francisco County District Attorney filed a two-count information against defendant charging him with the willful, deliberate, and premeditated murder of Seu V. Kuka in violation of section 187, subdivision (a), accompanied by an enhancement allegation that he personally and intentionally discharged a firearm causing great bodily injury and death within the meaning of section 12022.53, subdivision (d), and with possession of a firearm by a felon in violation of section 12021, subdivision (a)(1). A jury trial commenced in January 2010.

---

[1] All statutory references herein are to the Penal Code unless otherwise stated.

## The Prosecution's Case

### Police Discover the Body of Seu V. Kuka

Evidence presented at trial indicated that on July 23, 2007, approximately 10:49 p.m., San Francisco police officers heard gunshots from the area of the Sunnydale Housing Project (Sunnydale). They received a dispatch that shots had been fired on Blythedale Avenue in Sunnydale, and arrived at the scene at 10:51 p.m. They were waved down by people in the area and found the body of a man lying on the ground. The pulseless body, dressed in jeans, shirtless, with a jacket lying across the waist, appeared to one officer to have been moved based on the position of the body; it was face up, the head facing in one way and the legs, crossed, in the other, had gunshot holes in the chest and face, and there was blood beside the head. Everyone in the crowd around the officers denied seeing anything that occurred. There were no weapons around the body, and no murder weapon was ever recovered.

### The Testimony of Priscilla Lualemaga

Priscilla Lualemaga was the sole testifying eyewitness to the shooting, and the prosecution's key witness. She said that at the time of the shooting, she stayed at her grandmother's apartment on Blythedale Avenue (Blythedale apartment) during the week because it was closer to her work. She did not know or socialize with people in the neighborhood.

About two months before the shooting, Kuka moved in next door to Lualemaga, at which time Lualemaga learned Kuka was her distant relative. Lualemaga's father had a half sister, Lualemaga's aunt, who told Lualemaga the aunt was a half sister of Kuka, although the aunt had never met him.

Lualemaga noticed that Kuka spent time with defendant, who she saw approximately 30 times before the shooting. She also noticed that they spent time with a man whose name she did not know, identified at trial as Joshua Bradley, defendant's brother. At the time of the shooting, Lualemaga said, she did not know that defendant and Bradley were related.

3

According to Lualemaga, she returned home on the day of the shooting around 3:00 p.m. and saw Kuka, defendant, and Bradley drinking in front of the building. About 11:00 p.m. that evening, as she prepared for bed, she heard yelling, a slapping or hitting sound, and a man yell something like, "I'm going to get you." She pushed aside the shade of a bedroom window and looked out over a board that covered part of the window. She saw a shirtless Kuka looking "very angry" and chasing Bradley, with dozens of people watching. Both men ran very fast; Bradley ran to Lualemaga's car, which was parked by a light pole, and ran around the car. She could see their faces clearly at that time, even though it was nighttime.

Lualemaga testified that Kuka, as he ran around Lualemaga's car chasing Bradley, bumped into defendant, who "was kind of in his way." Kuka elbowed defendant "really hard" with his right arm, causing defendant to fall down, and ran down a hill after Bradley. Lualemaga could see defendant's face clearly. She was sure it was defendant.

Lualemaga said defendant got up "fast" and ran after Kuka. When defendant was right behind Kuka, defendant, whose face Lualemaga saw clearly, shot Kuka "two times, maybe" in the back before Kuka fell to his knees, and then kept shooting Kuka in the back maybe four or five times more. She was unsure how many shots were fired because "it happened so fast." She did not see a gun, but saw defendant holding his hand out like he was holding one, saw flashes, and heard gunshots. Defendant ran around a building as Kuka remained on the ground, face down. Lualemaga did not see that Kuka had any weapons.

Bradley was not with Kuka when Kuka was shot, and Lualemaga could not see him. About 25 people were outside and they tried to back away when the shooting occurred.

According to Lualemaga, defendant was wearing black jeans, a black, hooded "sweat sweater," and a white T-shirt, hanging out. She described the sweater as "a sweater that you pull over your head. Doesn't have a zipper, it has a hood." At trial, she said the hood was down. However, she acknowledged that she had said at the

4

preliminary hearing that she could not remember whether or not the hood was up or down that night.

Lualemaga further testified that she went outside when the police arrived and indicated to them that she had seen what had happened. They took her to the Ingleside police station and put her in a room that had "mug shots of individuals hanging on a wall." A police officer told Lualemaga to look through the mug shots; Lualemaga "kind of scanned through" them and saw the person Kuka was chasing, Bradley. She told the police officer that this was "the guy that Seu Kuka was chasing."

Lualemaga further testified that she did not recall defendant's name as of the night of the shooting, although she knew him by face. After she returned home that night, she called a cousin and asked her the name of the "guy" they had talked to a couple of weeks before, and her cousin said it was "Jamal."

Lualemaga said police came to her work place the next day and showed her a lineup card with six photographs. She identified one as the man Kuka was chasing and another as defendant, who, she told police, "could have shot" Kuka. She was scared when she made this statement that she might be required to testify, so she did not tell police she was "one hundred percent" sure of her two identifications, although she was that sure at the time.

Some months later, Lualemaga testified, she happened to watch the first and second seasons of a television program called "I Love New York." She recognized defendant in the first episode of the second season.

Lualemaga also said that, before the preliminary hearing, prosecutor Eric Fleming showed her a photograph, apparently of the mug shots that were on the wall of the room police took her to on the night of the shooting. She noticed a shot of defendant was directly above Bradley's, and one of David Trulove was also visible. She had not noticed them or identified them to police the night of the shooting, although she spent about two hours in the room. She had not looked at every mug shot on the wall that night. When asked why she did not notice defendant's photograph that night, she said, "I don't know. I just—that night only [Bradley's] stuck out to me." She said defendant looked different

5

in the photograph than he did the night of the incident. She said, "He looks younger; the hair is different. He just—this looks like an old photo. [¶] You would really have to look at it, to know it was him. When I walked up, I kind of briefly scanned through the pictures. I don't know. For some reason, [Bradley's] picture stood out."

Lualemaga testified that the photograph of defendant that police showed her at her work place the next day was the same one that was on the wall of the room. The parties stipulated that it was taken in 2003.

Lualemaga also testified that she had entered the witness protection program[2] shortly before testifying at the preliminary hearing because she was scared. She was "terrified" of testifying. When asked what she was afraid would happen, she said, "I was scared. I mean, you don't want to sit in court in this position and say, 'I saw you shoot Seu.' "

She said she had lied at the preliminary hearing when she said she did not talk to anyone about the shooting between July 23 and July 25, 2007 because she did not want to point out any family members who were in the courtroom. In fact, she had spoken to her cousin, who was present at the hearing.

As we will discuss, Lualemaga also testified about her fear of testifying at trial. She and her family were in the witness protection program at the time of the trial and unable to see the rest of her family. At her request, her sister's family, which was also staying at the Blythedale apartment, was also relocated to a safe place. Lualemaga received meal benefits of $875 per month, lodging costs between $1,350 and $2,500 per month, and storage fees. Lualemaga said she was testifying at the trial in order to do what was right.

### The Testimony of Officer Jim Trail

Officer Jim Trail of the San Francisco Police Department testified that he was detailed to the housing unit that worked at Sunnydale. He said he had known defendant

---

[2] The program was referred to at trial as both the " 'witness relocation program,' " and the " 'witness protection program.' " For consistency's sake, we will refer to it as the "witness protection program."

for years and saw him associating with Kuka a couple of times a week around Blythedale Avenue. Trail also saw defendant's brother, Bradley, there. David and Daniel Trulove were defendant's brothers, and David was about the same height and build as defendant. As we will discuss, a portion of Trail's testimony regarding defendant and his brothers was stricken, and is a subject of this appeal.

### The Testimony of Inspector John Evans

Inspector John Evans of the San Francisco Police Crime Scene Investigations Unit testified that on the night of the shooting, it was dark, but the lighting at the scene was good. Photos taken with a flash made the area look darker than it really was, and faces could be recognized in the available lighting. He recovered eight spent cartridge casings and a live round at the scene, as well as a deformed bullet, which he placed in a box and booked into evidence.

Evans testified that he measured the window from which Lualemaga viewed the shooting. He determined the distance from a person standing in the window to the sidewalk immediately below was 23 feet, from the window to the base of the light pole was 28 feet, 7 inches, and from the window to the knee of Kuka's body as found was 37 feet, 2 inches. Evans looked out the window during daylight and could recognize the faces of officers looking at the window from the light pole referred to by Lualemaga and where the body was found.

### The Testimony of Criminalist Andrew Smith

Criminalist Andrew Smith of the San Francisco Police Department, a firearms identification expert, testified that he examined seven spent cartridge casings, an unfired cartridge, and a damaged, fired bullet. He concluded that all the spent cartridge casings were fired from the same firearm, a semiautomatic pistol and, along with the unfired cartridge, were nine-millimeter Luger ammunition. He could not determine if the unfired cartridge was ejected from the same pistol that ejected the cartridge casings. The damaged, fired bullet was of a .380 auto or nine-millimeter caliber, which he could not determine further because of the damage to the bullet. He also could not determine if it matched the spent cartridge casings. The markings on the sealed box containing these

7

items indicated there was another envelope containing an eighth cartridge casing, which he did not find.

Smith also testified that a semiautomatic pistol operates differently than a standard revolver. An operator prepares a standard revolver to fire by placing individual cartridges in separate chambers of the revolver. The operator of a typical semiautomatic pistol places a magazine of cartridges into the grip of the pistol and pulls a slide back and lets it drop forward, thereby loading a live cartridge into the pistol's single chamber, located in the pistol's barrel; this is also known as "charging" the weapon. The operator must pull the trigger separately in order to fire each bullet, but does not have to do anything to remove the empty cartridge casings from the pistol's chamber. Upon each pulling of the trigger, a bullet is fired, the spent cartridge casing is automatically extracted from the chamber and ejected from the pistol, and another cartridge is loaded into the chamber. Also, if the operator charges the pistol when a live cartridge is already in the chamber, that cartridge is pulled out of the chamber and "kicked" out of the firearm. Thus, if the police found an unspent cartridge on the ground of a crime scene, one explanation would be that the operator charged the weapon while the cartridge was in the chamber.

### The Testimony of Assistant Medical Examiner Ellen Moffatt

Assistant San Francisco Medical Examiner Ellen Moffatt testified that she performed the autopsy of Kuka's body. The cause of death was multiple gunshot wounds. Kuka's body had 16 gunshot wounds, including entrance and exit wounds, from nine bullets. Five bullets entered the back of the head. Also, bullets entered the right side of the head and went through the sinuses before exiting the neck, damaging vertebrae and the left lung before lodging in the chest; the right back, going through the liver and exiting the right abdomen; and the lower right back, going through the kidney and lung before exiting the chest. Two entrance wounds had stippling around them, which indicated they were inflicted at close range. Moffatt opined that the wounds in the back were probably inflicted before the wounds to the head because the latter would be more quickly fatal.

8

Moffatt also testified that she visited the scene of the shooting and observed the body there. She used a flashlight and, although she could see faces clearly if they were nearby, the scene was "fairly dark." She thought it would not have been easy to see clearly beyond 10 to 15 feet.

The next day, Moffatt testified further about the lighting at the scene. She said that, at the request of the prosecutor, she went to the crime scene with the prosecutor, two inspectors, and two uniformed police officers the previous day, about 6:30 p.m., after sundown when it was "[f]airly dark." She said when she had testified the day before, the only recollection she had of the light on the night of the incident "beyond the flashlights that were on the body and the body bag was the porch light." She was not absolutely sure about this because she responded to a lot of crime scenes, including in that area. When she returned to the scene the day before, she saw a light post near the building at 140 Blythedale. She had no recollection from 2007 of noting whether or not that light post was there, or whether the face of a person standing underneath or near the light post would be illuminated, because she was focused on the body. She did not know whether the lighting she viewed at the scene the day before was the same as it was back in 2007.

### Stipulations Between the Parties

It was stipulated that defendant was a participant in the first and reunion episodes of the television show "I Love New York," aired on October 8, 2007, and January 6, 2008 respectively. It was also stipulated that he was arrested on October 27, 2008, and previously convicted of the felony of receiving stolen property in October 2003.

### Defendant's Case

### The Testimony of Dr. Geoffrey Loftus

Defendant presented the testimony of Dr. Geoffrey Loftus, an expert in memory and perception. Loftus testified that a witness to an event takes in jumbled bits of information and that memory can change over time as "post-event" information is received from other sources or because a witness infers things in an effort to make sense of the event.

9

According to Loftus, memory can become inaccurate for multiple reasons. There can be problems witnessing the event, such as a lack of enough light or time to observe the event, diverted attention, or being too far away. Witnesses tend to fill in missing details in events with low lighting, can usually observe only one thing at a time, and their recall ability can be affected by stress and fear. The length of the retention interval and the possibility of receiving "post-event" information can affect accuracy, as can the process of retrieving information from memory, such as to respond to leading or biased questions.

Loftus further testified that the circumstances in which photo lineups are shown can affect a witness's memory of an event. An investigator can consciously or unconsciously influence a witness when a photo lineup is not "double-blind" so that neither knows who is suspected. A photo lineup should not include more than one suspect because this increases the chances that a person will choose a suspect. Also, confirming to witnesses that the right choice has been made, even when it has not, can cause them to believe they made the right choice and that conditions of observation were better than they were.

Defense counsel gave Loftus a hypothetical based upon the facts of Lualemaga's observations. Loftus observed that, based on the distances traveled by the participants in the hypothetical incident, it lasted between 1.3 and 5 seconds, a very short time to observe an event. The collision between the victim and the shooter would have drawn the witness's attention, a shift of attention that would take one and a half seconds. Also, the problems caused by the darkness could not be compensated by additional time. Loftus concluded, "All in all, this is a set of circumstances that will be very poor for the witness's ability to accurately perceive and memorize what the shooter looked like." He also opined that while a 23-foot distance would not inhibit perception in daylight viewing, under nighttime viewing, it would have "in and of itself, a significant effect on a witness's ability to make out fine detail corresponding to facial appearance."

Loftus acknowledged it was easier to recognize the face of someone that you know. However, he said, that part of the brain that recognizes faces requires the witness

10

to observe the entire face, and does not work well if part of the face is hidden or the lighting is not good.  In poor viewing conditions, it would not really matter if the witness knew the person.  Accurately recognizing the person would be difficult or impossible.

### The Testimony of Defense Investigator Kenneth Heriot

Defense Investigator Kenneth Heriot testified that he went and looked out Lualemaga's bedroom window to the light post, both at day and at night, and observed that she would have to move over to the left side of the window to look up the avenue.  Also, at the time of the shooting, the entire bottom panel of the window was covered with a board.  When he looked out of the window at night, "it was dark."  Looking at a photographic exhibit, he said, "this light here, this streetlight obviously casts light down onto the sidewalk and the street.  And as you move further away from it, it gets darker."

Heriot was also cross-examined by the prosecutor, and a number of her questions were found to be argumentative, which we discuss further, *post.*

### The Testimony of Inspector Evans Regarding the Video Recording

The defense also called Inspector Evans as a witness and asked him if he had reviewed a DVD of the crime scene in the case.  He said he had and, after the DVD was played for the jury, acknowledged it was a true and correct copy of the crime scene video.

On cross-examination by the prosecution, Evans stated he watched the video three times, and concluded it was not an accurate portrayal of the lighting conditions on the night of the crime.  The night he was at the crime scene, he had an opportunity to view the area, and thought "[i]t was during the hours of darkness, but very well lit." Repeatedly, he recognized faces of the many officers at the scene.  He was able to view people from the distance between the window where Lualemaga witnessed the event and where the body lay. Also, there was "pretty much better lighting" under the streetlight.

### Closing Argument

We review many of the aspects of the prosecutor's closing argument in considerable detail in subpart V, *post,* in which we discuss defendant's claims of prosecutorial misconduct.  Therefore, we only briefly summarize her closing argument here.  The prosecutor began her closing argument by urging the jury to follow the law

that allowed it to rely on the testimony of a single witness, and discussed the reasoning behind this rule. The prosecutor repeatedly emphasized the courage of Lualemaga for coming forward despite her considerable fears of the dangers she might face by doing so and the hardships she had endured as a result of going into the witness protection program. The prosecutor argued that for her to do so, Lualemaga must be sure of her testimony and should be considered credible. The prosecutor also reviewed the other evidence of the shooting and urged the jury to review the evidence carefully as well. She argued there was sufficient evidence to find defendant guilty of first degree murder.

Defense counsel argued that the timeline indicated the incident happened very quickly and that Lualemaga's account did not make sense. He emphasized that she did point out defendant from the photos on the wall of the police station, although she sat there for two to three hours, and gave an uncertain identification of defendant at first. Defense counsel contended that Lualemaga received "post-event" information about defendant being charged that made her identification more certain, was not credible, viewed the incident on a dark night, and gave a vague and conclusory description of defendant. While Lualemaga may have felt like she was doing the "right thing," he said, that did not mean she was telling the truth, was accurate, or "got it right." He also contended Lualemaga was extremely emotional and had a relationship with the government.

Defense counsel also discussed the physical evidence. He pointed out that the live cartridge was found in the middle of the street, suggesting that the shooter charged the weapon before he shot Kuka. He further contended that it did not make sense that the person who was knocked down, got up and shot Kuka. Instead, he contended, the shooter came from another direction, charged the weapon, caught Kuka, and shot him.

Defense counsel emphasized Lualemaga's changing testimony. He contended she had lied in the preliminary hearing and when she said that she could not remember if defendant had his hoodie up or down (she said at trial that it was down). He suggested the person who was knocked down could have moved around a building and out of Lualemaga's sight, and questioned if Lualemaga could see the shooter's face. Her

12

positive identification of defendant, he noted, did not come until the preliminary hearing, in May 2009.

Defense counsel also touched on the close family that Lualemaga came from, which, he contended, grieved the loss of Kuka. He raised the possibility of inaccuracies in cross-racial identification, a subject testified to by Loftus.

Defense counsel concluded that Lualemaga was either a liar or mistaken, and her testimony could not be relied on because of her bias, her connection to the case, and her inability to see what was going on that night. Furthermore, her testimony was inconsistent with the physical evidence, and what could be inferred from it.

### *Verdict and Sentence*

The jury deliberated for four days. It requested read-backs of Lualemaga's testimony. It also requested further instruction on whether first degree murder required that the act be willful, deliberate, and premeditated before the first shot was fired, or whether it could become willful, deliberate, and premeditated with any subsequent shot, which the trial court provided. The jury found defendant guilty of first degree murder, found true the allegation that he had personally and intentionally discharged a firearm in the commission of that felony, and found him guilty of being a felon in possession of a firearm.

Defendant moved for a new trial based on purported trial errors, prosecutorial misconduct, and newly discovered exculpatory evidence, that being the recollections of two newly discovered witnesses. The trial court rejected the claims of trial errors and prosecutorial misconduct. It heard the testimony of the two witnesses, found the testimony was not credible, and denied the motion.

The trial court sentenced defendant to a total of 50 years to life imprisonment, with possibility of parole, that being 25 years to life for his conviction on count one for first degree murder, a two-year term to run concurrent for his conviction on count two for being a felon in possession of a firearm, and an additional 25 years to life to run consecutively for the enhancement allegation that he had personally and intentionally discharged a firearm in the commission of the murder.

13

This timely appeal followed. At argument, we asked the parties to submit additional briefing on whether we could and should modify the judgment so as to reduce the degree of defendant's first degree murder conviction. Both parties did so.

After hearing, defendant filed a petition for writ of habeas corpus on August 2, 2013, in case No. A139377. He has asked that we consider this petition with his appeal. We decline to do so.

## DISCUSSION

### I. *Defendant's Motion for a New Trial*

Defendant first argues the trial court committed prejudicial error when it denied his motion for a new trial based on his postconviction discovery of two new witnesses whose testimony called into question Lualemaga's credibility and gave a different account of the shooting. The People argue the trial court did not err because it was within its discretion to determine, as it did, that the witnesses were not credible. We agree with the People that the court did not abuse its discretion.

### A. *The Relevant Proceedings Below*

Following defendant's conviction, defense counsel learned of the two new witnesses and moved for a new trial. The court heard testimony from both witnesses.

The first witness stated that he was under arrest and present at the Ingleside police station on July 23, 2007, the day of the shooting. While there, he saw police officers talking to a large Samoan woman with her hair in a bun. The police were pointing to a clipboard and asked the woman if it was "like Jeremiah or Jermaine" Trulove, and the woman repeated several times that she did not know. Subsequently, about four weeks before he testified at this special hearing, he met defendant Trulove while incarcerated and recalled the incident. Defendant argued it could be inferred this woman was Lualemaga and that the testimony cast further doubt on her identification of defendant.

14

The second witness testified at a special hearing that this witness saw the shooting. The witness indicated that someone else was the shooter.[3]

The trial court denied the motion because it found neither witness's testimony was sufficiently credible to justify a new trial. It found the first witness's detailed description of an event three years earlier that lasted only seconds, coupled with his failure to recall details about the incident that brought him to the police station and his conversations with the defendant, made him not worthy of belief by a jury. The court noted that, even if the witness were telling the truth, there was nothing to indicate the woman he described was actually Lualemaga, as the trial testimony indicated Lualemaga did not recall defendant's name on the night of the shooting. Otherwise, she would not have had to involve her cousin, which she testified she had not wanted to do.

The court's reasons for finding the second witness not credible included discrepancies between the witness's affidavit and testimony, certain disparities in the witness's testimony, and the witness's explanations about not coming forward sooner. The court concluded that the witness's testimony was "not worthy of credibility . . . to go in front of a jury." The court also found that the witness's explanations for not coming forward earlier were not "sufficient to trigger a reasonably probable different result on retrial here."

**B. *Analysis***

The grant or denial of a motion for a new trial " ' "will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) In ruling on a motion based on newly discovered evidence, the trial court should determine, among other things, whether the evidence would probably render a different result on retrial. (*Id.* at p. 328.) To do so, the court may

---

[3] Defendant has filed the record and argument regarding this witness under seal in order to protect the witness's identity. The hearing at which he or she testified and at which argument was made was held in a courtroom closed to the public by agreement between counsel because of concerns expressed by the witness. While we have carefully reviewed the record, argument, and ruling of the court, we only summarily discuss them herein in order to respect these concerns about revealing the witness's identity.

15

consider the credibility and materiality of the evidence. (*Ibid*.) This court, in determining whether there has been a proper exercise of discretion on such motion, examines each case on its own facts, "recognizing that the trial court is in the best position to determine the genuineness and effectiveness of the showing in support of the motion." (*People v. Minnick* (1989) 214 Cal.App.3d 1478, 1481 (*Minnick*).)

Defendant contends his motion for a new trial should have been granted because the testimony of the two witnesses he presented impeached Lualemaga's testimony, casting doubt on her identification of defendant as the killer, and thus attacked the strongest evidence offered against him. Defendant relies principally on two cases for this assertion, *People v. Martinez* (1984) 36 Cal.3d 816 (*Martinez*) and *People v. Randle* (1982) 130 Cal.App.3d 286 (*Randle*). He argues the trial court's "novel ruling, which denied the motion for new trial based upon its own determination that the new defense witnesses were not worthy of belief, while crediting the uncorroborated testimony of the lone People's eyewitness at trial," requires reversal. Thus, defendant apparently believes that, as a matter of law, the trial court could not deny his motion based solely on its credibility determination. We disagree.

The People do not directly address *Martinez* and *Randle*, but we find them to be inapposite. In *Martinez*, our Supreme Court determined that the trial court abused its discretion in denying a new trial motion because it applied the wrong standard in its ruling. (*Martinez*, s*upra*, 36 Cal.3d at p. 823.) Specifically, the trial court found that the jury "probably" would have found the defendant guilty even with the newly discovered evidence, but our Supreme Court held that, "[e]ven if the jurors thought it more probable than not . . . , if there is a *credible* alternative explanation . . . a reasonable doubt would remain." (*Ibid*., italics added.) Thus, the *Martinez* court made clear that the credibility of the new evidence is always relevant. Therefore, *Martinez* does nothing to convince this court that reversal is warranted in the face of the trial court's determination that defendant's newly discovered evidence was not credible.

*Randle* is similarly inapposite. There, defendant was convicted of forced oral copulation based on the complainant's account. A defense investigator collected

16

numerous statements from witnesses that raised a question about the complainant's credibility and contradicted her trial testimony. (*Randle*, s*upra*, 130 Cal.App.3d at p. 293.) However, the case discussion does not indicate there was any concern about the *credibility* of the newly discovered evidence. To the contrary, the court noted that "[t]he new evidence does more than merely impeach [the complainant]—it tends to destroy her testimony by raising grave doubts about her veracity and credibility. Her credibility is central to the proof of the crime. [Citation.] [¶] The 20 declarations were made by 17 different individuals . . . with one thing in common; they knew the complainant's reputation. Their declarations detailed specific instances of public drunkenness, dishonesty, and public sex acts by [the complainant] and undermined her credibility." (*Id*. at p. 293.)

By contrast, here the court found the credibility of the two new witnesses to be lacking. We agree with the People that the principle we have quoted from *Minnick* controls here. That is, in determining whether the trial court has properly exercised its discretion on a motion for a new trial, we look at the facts of the particular case, "recognizing that the trial court is in the best position to determine the genuineness and effectiveness of the showing in support of the motion." (*Minnick*, *supra*, 214 Cal.App.3d at p. 1481.) The *Minnick* court determined that, in evaluating a motion for a new trial based upon a witness's recantation, the role of the trial court is first "to determine whether the new evidence is credible, i.e., worthy of belief by the jury." (*Id.* at p. 1482.) Only if it finds the evidence believable should the court decide whether its consideration would render a different result on retrial reasonably probable. (*Ibid*.)

In our own research, we have found other appellate courts that have acted in accord with the *Minnick* court's approach. (See *People v. Cua* (2011) 191 Cal.App.4th 582, 608 [in reviewing a trial court's ruling that the evidence was not such as to render a different result probable on retrial, we " 'accord considerable deference to the trial judge "because of 'his observation of the witnesses, [and] his superior opportunity to get "the feel of the case" ' "]; *People v. Cole* (1979) 94 Cal.App.3d 854, 859-860 [it was not improper for the trial court to deny defendant's new trial motion if it believed a trial

witness's proffered affidavit lacked credibility and would not have changed the result on retrial], overruled on other grounds in *In re Kelly* (1983) 33 Cal.3d 267, 277; *People v. Hill* (1969) 70 Cal.2d 678, 699 [the weight and credibility to be attached to the affidavit and testimony in support of a defendant's motion to vacate an order denying a new trial was for the trial judge to determine].)

Applying this *Minnick* principle here, we find no reason to disturb the trial court's ruling that defendant's newly discovered evidence lacked credibility. The trial court heard live testimony of both witnesses, was in the best position to make a credibility determination about these witnesses, and gave reasonable explanations for its findings based on specific evidence. We conclude the trial court did not abuse its discretion in denying defendant's motion for a new trial.

## II. *The Court's Denial of Motion to Dismiss for Untimely Discovery*

Defendant also argues the trial court erred in denying his pretrial motion to dismiss the case because his right to a fair preliminary hearing was violated by the prosecutor's failure to provide discovery requested by the defense. We disagree that there was prejudicial error.

### A. *The Relevant Proceedings Below*

In November 2009, before trial, the defense moved before trial for dismissal of the case. Among other things, the defense argued defendant's federal and state constitutional rights to complete discovery had been violated because the defense had not turned over what the defense considered to be exculpatory evidence pursuant to *Brady v. Maryland* (1963) 373 U.S. 83, Article I, section 7, subdivision (a) of the California Constitution, and Penal Code section 1054, et seq., particularly section 1054.5. The defense contended it had sought discovery informally in November and December 2008, but the prosecutor did not timely comply with these requests. While the defense was given some additional discovery regarding Kuka's criminal history, it was not given before the preliminary

18

hearing.  Also, it did not receive a summary of Kuka's criminal history until October 2009.[4]

Specifically, according to defense counsel's supporting declaration, in October 2009, the defense received "numerous police reports involving acts of violence by [Kuka]."  These included Kuka's arrest for assault with a firearm in 1996; a 2001 report that he had beaten a woman in a residence next door to the Blythedale apartment.  The report, defense counsel declared, indicated the residents were relatives of Kuka and uncooperative with police.  Another police report, apparently also from 2001, reported that Kuka had had tried to run over the same woman and her mother, crashed the car he was driving and further damaged it, and then smashed out the windows of the woman's vehicle.  According to defense counsel, when arrested for this incident, Kuka listed his residence as the Blythedale apartment.

Defense counsel attached to his declaration redacted documents provided to him in November 2008, and these same documents, unredacted, provided to him in October 2009.  He declared that, based on his review of these documents, he would have handled the case differently if he had been in possession of these unredacted documents, and that further investigation was needed.

The defense briefing pointed out that in the redacted document, it is handwritten that a person named "Nici" told someone, "Jamal did it."  Although not stated by the defense, the redacted document also states that a witness said, "Princess sd that Nici sd it didn't go down like that."  The defense did point out that in the unredacted document, it indicates a witness stated, after the reference to what Princess said, that, after the victim was hit and was trying to crawl away, Jamal ran over and said " 'No.' "  However, the defense did not quote the remainder of this unredacted sentence, which states that "Jamal

---

[4] The defense also sought dismissal because certain physical evidence had not been turned over.  However, its papers below indicate it requested this evidence after the preliminary hearing.  Defendant does not include this evidence as part of his appellate claim, so we do not discuss it further.

ran over + sd 'No [either '7' or 'F'][5] this N." The defense argued that the failure to provide this discovery was similar to the circumstances discussed in *Stanton v. Superior Court* (1987) 193 Cal.App.3d 265 (*Stanton*), and required dismissal of the information.

The prosecution opposed the motion. Prosecutor Fleming argued defendant was not entitled to the requested discovery prior to the preliminary hearing, which was not material to the cross-examination of Lualemaga at the hearing (identified in the hearing transcript as "Priscilla Maliolagi"), and that no constitutional right to discovery was triggered because the discovery was not exculpatory. Also, dismissal was an unduly harsh remedy.

The defense replied that *Stanton* applied and the People did not provide good cause for withholding information that included a witness statement containing a quote attributed to the defendant. The defense contended that without this information, defendant was precluded from fully investigating a claim of self defense, defense of others and third party culpability, and that it was for the defense, not the People, to decide whether these defenses existed in this case.

At the hearing, the defense argued that the prosecution's failure to provide the discovery violated defendant's "substantial rights to a preliminary hearing" because exculpatory information was withheld "that could potentially lead to a self-defense theory."

Prosecutor Fleming acknowledged he did not notice until October that the defense counsel was asking for criminal history. However, he denied there was any prejudice to the defense. It had had ample time to talk to "Nici" because her name had been turned over a long time ago, and the redacted statement was inculpatory, not exculpatory.[6]

---

[5] The parties disagreed below whether it was an "F" or a "7," with the defense contending it was an "F" and that the comment was directed at the shooter, not the victim.

[6] He implied Nici's statement had not been turned over because she was a juvenile, they did not know if she was going to testify, they did not have a direct statement from her, and "[t]here was an attempt to look at the needs of our citizens, who are afraid to come forward and testify . . . ."

20

Kuka's criminal history was not relevant to Lualemaga's impeachment at the preliminary hearing and it was speculative that the defense was prevented from presenting an affirmative defense at the preliminary hearing. Discovery of the victim's criminal history was turned over prior to 30 days before the last day of trial and the physical evidence, involving ballistics, was turned over as soon as it was available to the People. If defense counsel needed more time to examine the ballistics, he would have additional days to look into third-party culpability and talk with Nici. The prosecutor suggested an initial five days of continuance of trial, plus additional days to look at the ballistics evidence, would be sufficient to remedy any possible prejudice to the defense.

Defense counsel asserted that discovery was incomplete regarding the ballistics reports and certain aspects of the victim's criminal history, including whether Kuka was a gang member, if he had gone to prison, and a history of his drug dealing. He challenged that the discovery was only required 30 days before the last day of trial, pointing out that there had been three trial dates already. While the criminal history may not have been disclosed because of excusable neglect, there had been no good reason for the redaction of Nici's statement. He argued that, given these facts, the case should be dismissed.

The court then ruled. It stated:

"To set the context for this, the discovery statutes are governed by [section] 1054.1, et seq., of the Penal Code.

"And in terms of the remedies that can be sought, those are set out in [section] 1054.5 of the Penal Code.

"And one of the things that that code section makes specific reference to, in subsection (c), is that: 'The court shall not dismiss a charge pursuant [to] subdivision (b), unless required to do so by the Constitution of the United States.'

"So it is a federal constitutional determination that needs to be made in this regard, and as to whether or not there has been sufficient denial of due process so as to warrant dismissal.

21

"We have three categories of information that is part of this discovery—the discovery problems in this case: The victim's criminal history; Nici's redacted statements; and the ballistics reports. Those are sort of the three categories.

"In terms of looking at what's happened [in] this case, the court would find that all three of these categories are relevant items of discovery in this case. The court doesn't find that any of those would be irrelevant. They are all relevant.

The court continued regarding the evidence at issue in this appeal:

"With regard to both the victim's—with regard to the victim's criminal history and with regard to Nici's redacted statements, the court does find that there has been an unexcused delay with regard to not having turned that information over earlier; but the court does not find that either of those have been willful or intentional delays.

"The court finds that those have been in the nature of negligence by the district attorney, district attorney's office in this case.

"And the court is aware of the timing of this case and is aware that we are at the time for trial; but it is, nevertheless, before trial has started.

"The nature of the information, as I've indicated, I do think both of those categories, or all three categories, have been relevant. These are relevant.

"But given the court's finding that this was a negligent delay, and given all the factors in this case, the court does not find that there has been a sufficient denial of due process here so as to warrant dismissal under the federal Constitution.

"So the motion to dismiss for these discovery—for this late discovery is denied."

The court then asked if defense counsel had any comment on remedies short of dismissal. Defense counsel stated, "with respect to the court's ruling on the due-process violation, I understand that ruling." He said his client was "also entitled to a ruling on his motion to suppress for a violation of his statutory right to a speedy trial, because he has the right to be brought to trial within 60 days, by statute." The court denied the speedy trial motion because the right to effective assistance of counsel took precedence. Defense counsel stated for the record that the case was being continued because of the negligence of the prosecution and that dismissal was appropriate because "when the prosecution

screws up a case this badly, in these circumstances, essentially they've done it wrong. They got to do it over." The court reaffirmed its ruling.

The court then asked defense counsel if the trial should be reset to begin "in a couple of weeks" or in January. Defense counsel asked for two weeks, with the caveat that he could file a motion to continue if not ready, and the court set the trial to start in about two weeks.

At trial, the defense did not present any evidence based on the discovery that was the subject of this motion.

**B. *Analysis***

Defendant asserts he has a substantial right to present an affirmative defense at the preliminary hearing and to cross-examine witnesses, pursuant to *Jennings v. Superior Court* (1967) 66 Cal.2d 867. *Jennings* indicates that, pursuant to section 865, a defendant has the right to cross-examine witnesses and, pursuant to section 866, may produce witnesses to be sworn and examined. (*Jennings*, at p. 875.)

As defendant also points out, the People have a "fundamental 'duty . . . , even in the absence of a request therefor, to disclose all substantial material evidence *favorable to an accused*, whether such evidence relates directly to the question of guilt, to matters relevant to punishment, or to the credibility of a material witness.' " (*Stanton*, *supra*, 193 Cal.App.3d at p. 269.) This duty can precede the preliminary hearing. (*Ibid*.) " '[T]he suppression of substantial material evidence bearing on the credibility of a key prosecution witness is a denial of due process within the meaning of the Fourteenth Amendment.' " (*Id*. at p. 269.)

The *Stanton* court determined that the procedural vehicle for setting aside an information because of a prosecution's failure prior to a preliminary hearing to disclose material evidence favorable to the accused, where the deprivation of the substantial right is not shown in the transcript of the preliminary hearing, was a pretrial nonstatutory motion to dismiss. (*Stanton*, *supra*, 193 Cal.App.3d at pp. 270-271.) The court concluded that Stanton was denied a substantial right by the prosecution's failure to disclose an investigative report that was material for the purposes of cross examination.

23

(*Id*. at p. 271.) Because "[t]he defense was unquestionably handicapped by the prosecutorial error," the court, while it rejected the defense argument that the information should be dismissed, issued a peremptory writ of mandate commanding the superior court to strike a gross negligence allegation from the information because "[t]he magistrate, having heard the impeachment of the three key witnesses, might well have stricken the gross negligence allegation" or granted Stanton's motion to have the felony charges reduced to a misdemeanor. (*Id*. at p. 272.)

As for our standard of review, according to defendant, "[o]rdinarily, when a trial court has carefully weighed the nondisclosed exculpatory evidence against the transcript of the preliminary hearing, the Court of Appeal reviews the ruling under the abuse of discretion standard," as was done in *Merrill v. Superior Court* (1994) 27 Cal.App.4th 1586, 1597. Defendant contends that the trial court did not exercise its discretion here regarding the preliminary hearing, however, and, therefore, we should conduct a de novo review pursuant to *People v. Green* (1980) 27 Cal.3d 1, 24-26, overruled on other grounds, *People v. Martinez* (1999) 20 Cal.4th 225.

We do not necessarily agree that the trial court did not exercise its discretion regarding defendant's motion to dismiss. The record indicates the court denied the motion after consideration of the federal constitutional issues, review of the parties' papers, and argument at the hearing. Although the court found the evidence to be "relevant," the context suggests it was indicating it was relevant for trial, and not necessarily the preliminary hearing. Furthermore, defense counsel, when asked by the trial court if he had any further comment on remedies short of dismissal, stated that "with respect to the court's ruling on the due-process violation, I understand that ruling," and did not raise any questions about the completeness of the court's ruling.

Regardless, even under a de novo review, we conclude that defendant's argument is unpersuasive. The People presented Lualemaga as its only witness at the preliminary hearing, and she testified that she saw defendant shoot Kuka, similar to her description at trial. This was sufficient to support the information. Furthermore, our review of the evidence claimed by the defendant to be material and exculpatory shows that it was

24

neither. None of it was relevant to Lualemaga's cross-examination at the preliminary hearing. The only possible reading of the redacted portion of the notes referred to by defendant is that it is *inculpatory*, as it refers to Kuka crawling along the ground as defendant runs up and makes his statement, plainly indicating he made it regarding Kuka. Defendant's contention that Kuka's criminal history was material for purposes of the preliminary hearing because it could have led to his being held on a lesser charge based upon heat of passion or self-defense is speculative and unpersuasive.

Even assuming the prosecution erred in not turning over the evidence, we agree with the People that it was not prejudicial in light of the fact that none of it was presented at trial by the defense, a telling indication that it was not exculpatory and did not lead to other exculpatory evidence, despite the continuance granted by the trial and agreed to by the defense. As the People assert, defendant's guilty conviction makes it clear beyond a reasonable doubt under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24, that there was probable cause to hold defendant to answer the charges against him.

### III. *Defendant's Claims of Instructional Error*

Defendant also argues that the trial court's failure to give sua sponte instructions on defense of others, imperfect defense of others, and voluntary manslaughter based on heat of passion or sudden quarrel was instructional error requiring reversal. We disagree.

### A. *The Relevant Proceedings Below*

In his opening statement and closing argument, defense counsel did not refer to any facts that would support the sua sponte jury instructions defendant now argues the trial court should have given. In his opening statement, defense counsel discussed Lualemaga, the "one witness" in the case, said that she had given an "equivocal identification" to the police in 2007 and lied at the preliminary hearing, discussed problems with her anticipated testimony, and said he was going to ask the jury to find defendant not guilty because she was not a credible witness. In closing argument, he contended Lualemaga was either mistaken or a liar, and defendant was not the shooter.

Also, after the presentation of the evidence, when the trial court indicated the instructions that were to be given to the jury, the defense did not request further

instructions on any lesser included offense or other instructions. The court specifically asked counsel whether, "other than the issue of first degree murder and second degree murder, whether there was any request or theory under which there were any lesser includeds," and the counsel indicated that there were not. The trial court then instructed on the law of murder in the first and second degree.

**B.** *Analysis*

**1.** *Legal Standards*

A trial court has a sua sponte duty "to instruct fully on all lesser necessarily included offenses supported by the evidence. . . . [I]n a murder prosecution, this includes the obligation to instruct on every supportable theory of the lesser included offense of voluntary manslaughter, not merely the theory or theories which have the strongest evidentiary support, or on which the defendant has openly relied." (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149 (*Breverman*).) "[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obligated to instruct on theories that have no such evidentiary support." (*Id.* at p. 162.) "In a murder case, . . . both heat of passion and unreasonable self-defense, as forms of voluntary manslaughter, must be presented to the jury if both have substantial evidentiary support." (*Id.* at p. 160.) The court's duty exists "regardless of the tactics or objections of the parties, or the *relative* strength of the evidence on alternate offenses or theories." (*Ibid.*) " '[W]hen the charged offense is one that is divided into degrees or encompasses lesser *offenses*, and there is evidence from which the jury could conclude that the lesser offense had been committed, the court must instruct *on the alternate theory* even *if it is inconsistent with the defense elected by the defendant*." (*Id.* at p. 157.)

Regarding defenses, "a sua sponte instructional duty arises 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with defendant's theory of the case.' [Citation.] Thus, when the trial court believes 'there is substantial evidence that would support a *defense* inconsistent with that advanced by a defendant, the court should

26

ascertain from the defendant whether he wishes instructions on the alternative theory.' " (*Breverman*, *supra*, 19 Cal.4th at p. 157.)

When a court considers whether to give a sua sponte instruction, " '[s]ubstantial evidence' . . . is defined as evidence which is 'sufficient to "deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable men could have concluded ' " that the particular facts underlying the instruction did exist.' " (*People v. Burnham* (1986) 176 Cal.App.3d 1134, 1139, quoting *People v. Wickersham* (1982) 32 Cal.3d 307, 324, overruled on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 200-201 (*Barton*).)

We apply the de novo standard of review when evaluating an appeal that contends the trial court should have instructed sua sponte on a lesser included offense or defense. (*People v. Waidla* (2000) 22 Cal.4th 690, 733; see *People v. Elize* (1999) 71 Cal.App.4th 605, 610-616 [discussion indicating a de novo standard of review].)

### 2. *Lack of Sua Sponte Instruction on the Defense of Another*

Section 197 provides in relevant part that homicide committed by any person in the lawful defense of another is justifiable "when there is a reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished," but that the person acting or the person in whose behalf the defense is being made, "if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed." (§ 197, subd. (3).)

As we have discussed, a sua sponte instruction is only required for a defense if the theory is not inconsistent with the defense theory of the case. (*People v. Burnham*, *supra*, 176 Cal.App.3d at p. 1139.) Defendant argues there was substantial evidence to support a theory of defense of another that is consistent with his misidentification defense.

Regarding consistency, defendant contends, "[t]he defense would apply whether the shooter was [defendant], one of [defendant's brothers], or a neighbor trying to prevent Kuka from inflicting great bodily injury upon Bradley," who was defendant's brother. We do not see how this could be the case. It is obviously inconsistent to assert defendant

was not the shooter *and* shot Kuka in defense of his brother. If the former is true, the latter could not be the case, and vice versa.

Defendant asserts that, regardless, the court, even if it found the defense of another theory to be inconsistent, failed to ascertain from defendant whether he wanted the instruction given, although the court was required to do so. (*Breverman*, *supra*, 19 Cal.4th at page 157.) The People suggest the court satisfied this obligation because "[defendant] did not request the instruction when given the opportunity to do so," presumably when the court asked the parties if they wanted any further instructions to be given. We need not decide this issue because, in any event, we conclude there was not substantial evidence to support the sua sponte instruction.

Defendant asserts that "there was substantial evidence that the shooter shot Kuka to prevent Kuka from 'getting' Bradley and inflicting imminent harm upon him." We do not see such evidence. Lualemaga testified that she saw Kuka chasing a person, later identified as Bradley, while seeming to be "very angry" and "intent" on catching Bradley. She saw defendant shoot Kuka as Kuka continued to chase this person, who had disappeared from her view by that time. There was no evidence that Kuka was armed, or that he was close to catching Bradley, and it is not clear what he would have done if he had caught Bradley. Based on these facts, we conclude there was not substantial evidence of imminent danger of great bodily injury to Bradley. As the People contend, "[a]t most there was evidence of potential future harm to the other person." We also agree with the People that "no reasonable juror could have inferred from the evidence that [defendant's] use of deadly force was reasonably necessary to defend the other person" under these circumstances. This is certainly the case with the six shots fired into Kuka's head, which, according to Moffatt's testimony, were probably fired after the shots that knocked Kuka to the ground, rendering him harmless to Bradley. Therefore, there was no substantial evidence to support an instruction of defense of another. The court did

28

not have a sua sponte duty to provide such an instruction, or to ask the defense if it wanted such an instruction given.[7]

Defendant argues that, if we conclude a "defense of another" instruction was not required, the trial court also erred when it sustained the prosecutor's objection to the defense's questioning Lualemaga about whether Bradley appeared to be running in fear of Kuka. This was relevant "to whether the shooter would believe that force was necessary to prevent an imminent harm from Kuka," and denied defendant his Sixth Amendment right to present a defense. We disregard this dubious claim because defendant does not provide a proper record citation to the objection. " ' "It is the duty of the party to support the arguments in its briefs by appropriate reference to the record, which includes providing exact page citations." ' " [Citation.] Because '[t]here is no duty on this court to search the record for evidence' [citation], an appellate court *may* disregard any factual contention not supported by a proper citation to the record [citation]." (*Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1379.)

### 3. *Lack of Sua Sponte Instruction on Voluntary Manslaughter*

Defendant also argues the trial court prejudicially erred by not instructing on the lesser included offense of voluntary manslaughter, based on either the doctrine of imperfect defense of others, sudden quarrel, or heat of passion. Again, we disagree.

#### a. *Imperfect Defense of Others*

The doctrine of imperfect defense of others is that "[o]ne who kills in imperfect defense of others—in the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury—is guilty only of manslaughter," not murder, "*because he lacks the malice required for murder*." (*People v. Randle* (2005) 35 Cal.4th 987, 997, overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172,

---

[7] Defendant also points out that the prosecutor indicated in closing argument that the doctrine of defense of others did not apply to this case, and argues that, given that the prosecutor "feared (even in the absence of instructions from the trial court) that a juror might reasonably conclude that the doctrine . . . might apply, the People cannot now argue that there was not substantial evidence of defense of another." Defendant provides no legal support for the argument, which we find unpersuasive.

1201.)  The duty to give a sua sponte instruction exists "whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense."  (*Barton*, *supra*, 12 Cal.4th at p. 201.)

Defendant argues that there was substantial evidence in the case to support the instruction because a reasonable juror could believe that "the shooter's" judgment was clouded by anger after being "smashed" to the ground, hearing Kuka threaten to "get" Bradley, and watching Kuka "chase down" Bradley.  From this evidence, defendant argues, a juror could reasonably conclude that "the shooter believed the visibly angry Kuka was armed or was otherwise about to inflict great bodily injury upon Bradley" and that "the shooter rapidly fired multiple bullets at Kuka in response to the threat to Bradley."

Defendant's argument is not persuasive.  We do not see evidence in the record that would allow a juror to reasonably conclude that the shooter believed the angry, shirtless Kuka was armed or about to inflict great bodily injury on Bradley.  Also, defendant's argument ignores that the shooter fired many more bullets at Kuka than were necessary to prevent him from continuing to chase Bradley, undermining the theory that the shooter's actions were motivated by an actual but unreasonable belief that he was defending Bradley from imminent danger of death or great bodily injury.  The facts do not establish substantial evidence for the instruction, in contrast to the evidence discussed in the cases cited by defendant.  (See *Barton*, *supra*, 12 Cal.4th at pp. 202-203 [defendant testified that the victim swung at defendant with what appeared to be a knife and ignored the demand to drop the knife, then made a sudden movement towards him, even though no knife was found]; *People v. Randle*, *supra*, 35 Cal.4th at pp. 991-992 [evidence that defendant shot the victim as he was beating defendant's accomplice]; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179 [prosecution's chief witness against defendant testified the victim was choking defendant when defendant drew a gun and shot him].)  We conclude there was not sufficient evidence to require the court to sua sponte instruct the jury on the lesser included offense of imperfect defense of others.

30

### b. *Sudden Quarrel or Heat of Passion*

As defendant points out, sudden quarrel or heat of passion, as stated in CALCRIM No. 570, arises if the defendant, as a result of being provoked, "acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment," *and* "[t]he provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than judgment." (CALCRIM No. 570, see also *Barton, supra*, 12 Cal.4th at p. 201 [defining the law similarly under former CALJIC No. 8.42].)

Defendant theorizes that there was substantial evidence here to support the heat of passion or sudden quarrel instruction because "Kuka threatened to 'get' Bradley"; Lualemaga heard some hitting and slapping sounds, and she saw Kuka "angrily chasing Bradley when he 'smashed' into the shooter and knocked him to the ground hard. The shooter immediately got up and started shooting at Kuka, who was still chasing Bradley. A properly instructed jury could conclude that Kuka's violent smashing of the shooter to the ground and Kuka's threats and chasing of Bradley were sufficient to cause the shooter's 'reason [to be] obscured by passion to such an extent as would cause an ordinarily reasonable person to act rashly and without reflection,' and that the shooter thus shot Kuka in a sudden quarrel or heat of passion."

Defendant's theory is unpersuasive. Lualemaga testified that she heard a male voice yell, "I'm going to get you, or something like that," and acknowledged that she told the police she heard some sort of clapping sound, like hitting. There is no direct evidence that these sounds came from Kuka or that the *shooter* heard them. The record does not indicate where defendant was located before he appears by Lualemaga's car. We can infer little from these uncertain facts.

We are left, therefore, with very bare facts, they being that the shooter was knocked hard to the ground by Kuka as Kuka angrily chased Bradley, who was defendant's brother, whereupon the shooter got up and chased after Kuka, who was continuing to chase after Bradley. The shooter caught up to Kuka and shot him in the back, causing Kuka to fall to the ground head first, and the physical evidence and

Moffatt's testimony indicates the shooter then continued to shoot Kuka six times, specifically to the head. Again, there is no evidence that Kuka was armed, or gave the appearance of being armed. Nor is there any evidence that the shooter displayed any emotion. Given these very bare facts, we conclude they are not sufficient evidence to require the court to give the sua sponte instruction. They are far less compelling than the facts discussed in the cases cited by defendant, in which it was determined that the instruction should have been given. (See *Barton*, *supra*, 12 Cal.4th at p. 202 [there was evidence that defendant confronted a man who had threatened defendant's daughter with serious injury, whereupon the man went berserk, got into a fighting stance, challenged and taunted defendant, and appeared to defendant to have a knife]; *Breverman*, *supra*, 19 Cal.4th at p. 163 [there was evidence of a "sizeable group of young men, armed with dangerous weapons and harboring a specific hostile intent, trespassed on the domestic property occupied by defendant and acted in a menacing manner," and that this caused fear and panic to defendant and others].)[8]

Defendant argues that the trial court's duty to instruct on heat of passion is not undermined by the fact that a defendant fired multiple shots, when it appears that all the shots were fired quickly, citing *Breverman*, *supra*, 19 Cal.4th. at pages 163-164. However, the facts discussed in *Breverman* were much different than those here, involving a "sizeable group of young men, armed with dangerous weapons and harboring a specific hostile intent," who trespassed in a menacing manner on defendant's property. (*Id*. at p. 163.) Under those circumstances, the *Breverman* court held that a reasonable jury could conclude defendant was aroused to passion, and his reason obscured, by a provocation sufficient to produce such effects in a person of average disposition. (*Id*. at pp. 163-164.) This included an initial volley of shots defendant fired from inside the house and a second volley fired at fleeing intruders that proved fatal. (*Ibid*.)

[8] Defendant also cites two cases in which appellate courts found voluntary manslaughter upon sudden quarrel after review of the evidence. (See *People v. Kent* (1955) 132 Cal.App.2d 588, 590; *People v. Elmore* (1914) 167 Cal. 205, 211.) The cases involved extensive fights and alcohol, however, of which there is no evidence in the present case. (*Kent*, at p. 590; *Elmore*, at pp. 207-210.)

The circumstances of this case are quite different. The evidence indicates that the shooter shot Kuka six times in the head after sending him to the ground, face first, by previous shots to the back. Although the evidence indicates the shooter was knocked to the ground by an unarmed Kuka before firing all of these shots, it also indicates the shooter arrived at the scene armed with a loaded semiautomatic pistol that he at some point charged in order to fire. This evidence indicates the shooter did not act rashly and without judgment. The manner of the shooting here did not provide substantial evidence to support a sua sponte instruction regarding sudden quarrel or heat of passion.

In light of our conclusion that the court acted properly in not giving sua sponte instructions regarding defense of another, or involuntary manslaughter based on imperfect defense of others or sudden quarrel or heat of passion, we do not discuss the parties' debates regarding the prejudicial effect of any such errors.

**4. *Claim of Late Discovery and Ineffective Assistance of Counsel***

Defendant also argues that if the evidence introduced at trial was not sufficient to require sua sponte instructions on defense of others, imperfect defense of others, or sudden quarrel or heat of passion, this court should nonetheless reverse because there was substantial additional evidence supporting these defenses that was not introduced at trial due either to the state's failure to provide timely discovery or due to ineffective assistance of counsel. We disagree.

**a. *Relevant Proceedings Below***

As we have discussed, on the eve of trial, the trial court ordered a two-week continuance of the trial based on the People's late production of certain discovery materials to the defense regarding Kuka's prior arrests and/or convictions.

Also, just prior to trial, the People moved to exclude evidence of Kuka's bad character, including Kuka's prior arrests and convictions. Defense counsel responded that, since he did not know of Kuka's criminal history until October 30, 2009, it was still a "subject of ongoing investigation." At the moment, he did not see the relevance of Kuka's bad character and did not intend to introduce evidence about it. Based on that, the court deferred ruling on the People's motion.

33

The People also moved to exclude evidence of the victim's toxicology results, which showed a blood alcohol level over the legal limit, because the defense "so far has seemed to go along the lines of identification," and any tattoos that were not part of the autopsy photographs. The defense did not assert the evidence was relevant, and the court deferred ruling on the matters.

After opening statements, the defense counsel complained to the court that, while the defense had received "voluminous documents" from the People regarding "gang profiles" for defendant and a defense witness, the defense had received "no such workup on the victim," and theorized that it existed if all three were from the same neighborhood. The prosecutor stated that she did not know that such a file existed, and argued that, regardless, the People had no obligation to produce it. Asked by the court for a theory of relevance, defense counsel stated that, "in order to have a complete record, I've sort of been placed in a position where I am forced into a particular defense because of late discovery by the People," and that "in an identity case . . . there's potential third-party culpability theories . . . , certainly the gang file on the victim would be relevant." The court ordered the People to turn over the discovery if it existed. In the end, none of this subject matter was introduced into evidence at trial.

### b. *Analysis*

Defendant first argues that reversal is necessary because the evidence was not presented at trial as a result of the People's late discovery production. This is unpersuasive, even assuming the evidence was somehow relevant. The trial court granted a two-week continuance of the trial when the late discovery was first discussed, which defense counsel agreed to, subject to the right to ask for further continuances. Defendant does not indicate that he made any further request, or needed a further continuance.

As for the defense request for a gang file regarding Kuka, if it existed, defendant does not establish that any such file existed or was turned over. We reject defendant's argument as it relates to this speculative material.

Defendant next argues that his trial counsel's failure to present the evidence amounted to a "classic case of ineffective assistance of counsel." This argument is also

34

unpersuasive, because, again, assuming the evidence might have been relevant to some possible defense theory, it is apparent defense counsel had a tactical reason not to use it to suggest any theory of the "defense of another" theory or voluntary manslaughter.

In order to establish a claim of ineffective assistance of counsel in a direct appeal, a "defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it 'fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms.' [Citations.] Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.] If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 745-746.)

Here, we presume defense counsel's performance fell within the wide range of professional competence and his decision not to introduce evidence of Kuka's violent character, past gun use, gang ties, and high level of intoxication can be explained as a matter of sound trial strategy. Trial counsel presumably determined that misidentification was the best defense. To present any evidence regarding the defense of another, or voluntary manslaughter, would have been inconsistent with it and confusing to the jury. Furthermore, nothing about the purportedly withheld evidence alters our conclusion that the evidence of the shooter firing six shots into Kuka's head after Kuka fell to the ground seriously undermines any argument that the court should have given sua sponte instructions regarding the defense of another and voluntary manslaughter.

## IV. *Defendant's Evidentiary Error Claims*

### A. *Lualemaga's Testimony*

Defendant next argues that the trial was "marred by highly prejudicial evidentiary error permitting admission of Lualemaga's fear of [defendant] and his family, and the fact that the district attorney's office had to protect Lualemaga and her sister by placing them in a witness relocation plan," which was exacerbated by the prosecutor's focus in closing argument on Lualemaga's fears and difficulties in the witness protection program. Defendant argues the error violated defendant's federal constitutional right to due process of law.

#### 1. *The Relevant Proceedings Below*

Prior to trial, defense counsel objected for lack of relevance to the introduction of evidence about Lualemaga being relocated and receiving assistance, such as rent, from the district attorney's "Victim Witness Assistance Program." He conceded that Lualemaga could testify that she had previously denied speaking to others about the crime for fear those people might become involved in the process, but objected on foundation and hearsay grounds to the admission of evidence that other people were in fear of coming forward.

The prosecutor argued that Lualemaga's fear about, and attitude towards, testifying was clearly relevant to her credibility, as was her relocation and the effect this had on her and her attitude about testifying.

The court ruled that Lualemaga could talk about her own attitude towards testifying and relocation, but not about anyone else's fear. Also defense counsel could cross-examine on the financial assistance provided to Lualemaga.

On direct examination, Lualemaga testified that she moved out of the Blythedale apartment in August 2008, but that members of her family continued to live there when she learned she had to testify at the May 2009 preliminary hearing. She testified, without objection by defense counsel, that she was "terrified" that she would have to do so. She was scared to sit in court and say, " 'I saw you shoot [Kuka].' " She was afraid that

36

"[s]omething bad might happen, because I'm sitting here scared for my life, for my family's life."

Lualemaga further testified that she discussed her fear with a prosecutor, Fleming, who told her about the witness protection program, which she decided to enter. She discussed the hardships she endured while in the program, which included that she, her husband, and their one-year-old child moved into one hotel, then another, and then into another location, she gave birth to a new baby, and her family were not permitted to see other family. The record indicates she became emotional in discussing these hardships.

On redirect examination, Lualemaga was asked why, when police showed her a photograph of defendant the day after the shooting, she said only that it "look[ed] like the guy who could have shot" Kuka. She said she was sure at the time who shot Kuka, and that she did not mean for her statement to the police "to come out that way," but was scared that if she identified defendant, she would "be sitting here," and "would have to face him and say, 'I see you. This is the person I seen shot [Kuka].' " Asked what she feared was going to happen if she testified, she said, "Just people who are probably related to [defendant], or friends with him, you know. They're—they want to support him. And I'm just—I was scared. I don't know. Maybe revenge on me, or my family."

The prosecutor asked Lualemaga who had recently lived in her former bedroom. Over two defense objections based on relevance and a third that was unspecified, Lualemaga was permitted to testify that her sister had lived there, that Lualemaga had feared for her safety if Lualemaga were to testify at trial, and that the prosecutor, at Lualemaga's request, had arranged to relocate the sister and her family to a safe place.

Later in the trial, the prosecution objected to providing the defense with additional documentation about the benefits Lualemaga had received in the witness protection program. The defense asked the court to examine all of the documentation in camera. Ultimately, the court met in camera with both counsel and an official from the bureau of investigations of the district attorney's office. The court reviewed a witness agreement, a confidential memorandum setting out different monthly costs paid for Lualemaga, and a

37

document setting out costs for an additional month before her formal entry into the program.

These documents were given to the defense counsel. He argued he was entitled to more and the prosecutor disagreed.

The court ruled the production was sufficient, and it would not require the prosecution to provide "further kinds of evidence in terms of who the storage costs were paid to or who the residential costs were paid to or the moving providers" because that kind of information involved "a potential risk to the witness" and was not necessary for impeachment purposes. The court would allow an inquiry by the defense, "limited to the amounts and the specific purposes for those amounts and time frames for the amounts."

In closing argument, the prosecutor made repeated references to Lualemaga's fear of testifying, her experience in the witness protection program, and her concerns about the safety of her family members, doing so to argue that the jury could and should rely on the testimony of just one witness to convict defendant, and that Lualemaga was telling the truth. The prosecutor repeatedly praised Lualemaga's courage in coming forward despite her fears, implored the jury to follow her example, and emphasized her difficulties in the witness protection program. For example, she told the jury:

"Her life will never be the same. How sure would you have to be to do what she has done; to give up what she has given up? How sure would someone have to be to risk her life?

"Not just moving away. Not just moving, losing a job. How sure would you have to be to put your life in peril?

"How sure would you have to be to know that, because of what you're doing, because you're standing up and doing the only thing that's right; that is, pointing out the defendant as a murderer, how sure would you have to be before you would risk your life on it?"

## 2. *Analysis*

### a. *Forfeiture*

As a preliminary matter, the People argue that defendant forfeited, for lack of objection, his appellate claim regarding all of the issues he raises, except his claim regarding Lualemaga's fears for her sister and her sister's family, to which defense counsel properly objected. We agree.

Generally, " ' "questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." ' " (*People v. Williams* (2008) 43 Cal.4th 584, 620; Evid. Code, § 353, subd. (a).)

Defendant refers to his pretrial objections, which we have already summarized. " '[A] motion *in limine* to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfies the basic requirements of Evidence Code section 353, i.e.: (1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context.' " (*People v. Rowland* (1992) 4 Cal.4th 238, 264, fn. 3.) Defendant objected to the admission of evidence of Lualemaga's relocation and the payments she had received in the witness protection program, as well as of her fears, on relevance grounds, which the court rejected. Therefore, he has preserved an appellate claim that such evidence was not relevant. However, he has forfeited claims that such evidence was not admissible on grounds *besides relevance* because of his failure to first raise such grounds below. (*People v. Williams*, *supra*, 43 Cal.4th at p. 620; Evid. Code, § 353, subd. (a).)

Defendant claims admission of evidence of Lualemaga's fear and her participation in the witness protection program was highly prejudicial for numerous other reasons besides lack of relevancy, including that the evidence of Lualemaga's placement in the witness protection program "essentially vouched that Lualemaga and her family had good reason to fear [defendant] and his family"; that the prosecutor's closing argument

39

"exacerbated" the prejudice caused by the erroneous admission of this evidence; that the admission of this evidence deprived defendant of his federal constitutional right to a fair trial because it was highly prejudicial "hearsay evidence, admitted without foundation or confrontation, vouching for the district attorney's opinion and assessment that there were enough sufficiently credible threats to Lualemaga's safety that she should be placed in the program and that these additional steps were necessary to protect her," and "crossed into evidence of threats suggesting that [defendant] had, in fact, threatened Lualemaga, that [defendant] was a continued threat to her safety, and that [defendant] was generally a dangerous person." Defendant further argues the evidence "crossed into impermissible evidence of criminal propensity, but also improperly suggested a consciousness of guilt." Defendant made none of these objections before or during trial and, therefore, has forfeited these claims.

### b. *No Error*

Even if these claims were not forfeited, there was no error in admitting evidence of Lualemaga's fears and participation in the witness relocation program, nor in admitting her concerns about her sister and her sister's family.

All relevant evidence is admissible unless it is excluded by statute or violates a state or federal constitutional provision. (Evid. Code, § 351; Cal. Const., art. I, § 28, subd. (f)(2) [the California Constitution's "Truth in Evidence" provision, which contains certain statutory exceptions to the admission of relevant evidence]; *People v. Williams* (2002) 28 Cal.4th 408, 415 [generally, the exclusion of relevant evidence "is barred by the California Constitution's Right to Truth in Evidence provision, unless otherwise compelled by the federal Constitution"].)

Furthermore, as defendant concedes, evidence of a witness's fear of testifying is admissible to evaluate that witness's credibility pursuant to Evidence Code section 780. It provides that, except as otherwise provided by statute, "the court or jury may consider in determining the credibility of a witness any matter that has a tendency in reason to prove or disprove the truthfulness of [her] testimony," including the witness's demeanor while testifying and attitude toward the giving of testimony. (Evid. Code, § 780, subds.

40

(a), (j).) " 'Evidence a witness is afraid to testify is relevant to the credibility of that witness and is therefore admissible. [Citations.] Testimony a witness is fearful of retaliation similarly relates to that witness's credibility and is also admissible. [Citation.] It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible.' " (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368 (*Olguin*).) Therefore, argument regarding this evidence is proper as well.

Defendant argues that we should distinguish *Olguin* from the present case because the *Olguin* trial court gave a limiting instruction to the jury to consider the evidence only with respect to the witness's state of mind (*Olguin*, *supra*, 31 Cal.App.4th at p. 1368), and the prosecutor in the present case, unlike in *Olguin*, purportedly suggested that there had been threats of revenge and retaliation to Lualemaga. Regarding defendant's first contention, nothing in *Olguin* indicates that a limiting instruction is required and none was requested here by the defense. Furthermore, after examining defendant's record citations, we find no merit in the contention that the prosecutor suggested there had been threats of revenge and retaliation to Lualemaga. *Olguin* is applicable here.

We also conclude Lualemaga's testimony would have been admissible pursuant to Evidence Code section 352, one of the statutory exceptions referred to the Truth in Evidence provision of the California Constitution (Cal. Const., art. I, § 28, subd. (f)(2)), if the defense had made an objection based on this statutory provision. Evidence Code section 352 gives a court the discretion to exclude arguably relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We review such rulings pursuant to an abuse of discretion standard, and will uphold them unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner. (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)

As the People point out, "generally, violations of state evidentiary rules do not rise to the level of federal constitutional error." (*People v. Benavides* (2005) 35 Cal.4th 69,

41

91, citing *Estelle v. McGuire* (1991) 502 U.S. 62, 70 [noting that the Supreme Court is not " 'a rule-making organ for the promulgation of state rules of criminal procedure' "].) Furthermore, " '[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense.' " (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.)

Here, Lualemaga's discussion of her fears about testifying, as well as her participation in the witness protection program, were highly relevant to the jury's evaluation of her credibility. Although her trial identification of defendant as Kuka's killer was strong and consistent with the physical evidence, her testimony nonetheless acknowledged prior conduct that arguably raised questions about her credibility.

Specifically, Lualemaga acknowledged that on the night of the shooting, the police asked her to look at mug shots on the wall of a police station room, one of which depicted defendant, but that she only "briefly scanned" the wall, did not look at every photograph, and did not see defendant's photograph. She acknowledged that she only tentatively stated her initial identification of defendant as the shooter to police the day after the shooting, although at the time she was sure he was the shooter. She also admitted that she lied at the preliminary hearing when she said she had not talked to anyone about the shooting in the days that immediately followed, when she had asked her cousin about defendant's name. Lualemaga explained that her conduct in each instance was related to her nervousness and her fear of what might happen to her if she testified, and indicated that she felt safer once she was in the witness protection program.

Given Lualemaga's acknowledgment of this previous conduct, the evidence was highly probative of her frame of mind and conduct in talking to authorities and testifying at the preliminary hearing and trial and, therefore, of her credibility. Her testimony was not particularly prejudicial either. It is not surprising that the only witness to a shooting like the one that occurred here might have fears about what might happen to her if she cooperated and testified, and that these fears were lessened by her participation in the witness protection program. Her testimony about the hardships she endured in the program was relevant to the jury's evaluation of her credibility as well, as it arguably

42

indicated she was willing to endure them because of her certainty about what she saw on the night of the shooting.  Even if defendant had made an objection based on Evidence Code section 352, the relevance of this testimony greatly outweighed any prejudice caused by its admission.

We reach this same conclusion regarding Lualemaga's testimony about her concerns for the safety of her sister and her sister's family, which, she testified, prompted her shortly before trial to request that the district attorney also put her sister and her family into the witness protection program.  The court rightly rejected defense counsel's objection that this line of questioning was not relevant.[9]  Lualemaga's account of what frightened her about testifying at trial, and what was done to alleviate her fear, was also relevant to the jury's evaluation of her credibility because it arguably indicated she wanted to truthfully testify about what she saw, but was afraid to do so.

We discuss at length in subpart V, *post,* defendant's claims of prosecutorial misconduct, and so only briefly discuss them here.  We reject defendant's claim that the prosecutor's closing argument remarks to the jury about Lualemaga's fears, participation in the witness protection program, and concerns for the safety of her sister and her sister's family were somehow prejudicial for the same reasons that we reject his challenge to the evidence itself.  That is, defendant has forfeited his appellate claims.  Moreover, the prosecutor's remarks were made as part of a lengthy argument to the jury why, although Lualemaga was the sole eyewitness to the shooting, the jury should nonetheless rely on her testimony because all the circumstances indicated that it was very credible.  This was argument based on relevant evidence which probative value outweighed any prejudice caused by its admission.

Defendant also argues that Lualemaga's testimony constituted evidence of uncharged crimes or criminal propensity by defendant, as well as of threats against, and intimidation of, Lualemaga as a witness, that he should not have been tried "on the basis of imagined threats" or "unsupported claims that [defendant] was a danger to Lualemaga

---

[9] Defense counsel did not raise an objection specifically based on Evidence Code section 352, but our analysis would be the same if he had.

43

and her family," and that the admission of this evidence violated his federal constitutional right to due process of law. He contends that "the error is so plain that counsel's failure to object to such evidence is ineffective assistance of counsel." He asserts that given these evidentiary prohibitions, "courts have been particularly careful in admitting evidence suggesting that a witness has been threatened or intimidated, as opposed to evidence that the witness is afraid of testifying, which is admissible to evaluate the witness's credibility."

None of these arguments are supported by the record. Lualemaga did not testify about defendant's history, character, or criminal propensity, or about any actual conduct by defendant or his family, after the shooting. She only expressed her fears about coming forward and testifying, including about what defendant or his family might do to her as a result. She discussed these fears in response to questions plainly directed at explaining her own conduct as a witness over time and, as we have discussed, this was very relevant to her credibility. As the People point out, our Supreme Court has made clear that such testimony is admissible. In *People v. Warren* (1988) 45 Cal.3d 471, the court concluded about a prosecutor's line of questioning: "We believe that the prosecutor did not act improperly . . . . He asked the witness about fear, not threats. Although evidence that a defendant is threatening witnesses implies a consciousness of guilt and thus is highly prejudicial and admissible only if adequately substantiated [citations], *evidence that a witness is afraid to testify is relevant to the credibility of that witness and therefore admissible*." (*Id.* at p. 481, italics added.)

In conclusion, defendant has forfeited his appellate claim. He also fails to establish that Lualemaga's testimony about her fears and participation in the witness protection program was inadmissible, the prosecutor committed misconduct in referring to these matters in closing argument, or any part of Lualemaga's testimony constituted inadmissible other crimes, bad character or criminal propensity evidence, evidence of threats or intimidation, or otherwise violated his federal constitutional rights. In light of our conclusion, we do not address the parties' debate over whether the purported errors were prejudicial.

## B. *Officer Trail's Testimony*

Defendant also argues that prejudicial constitutional error occurred when Officer Trail's testimony on cross-examination indicated defendant and his brothers had been arrested before and purposely misidentified themselves to police. We agree with the People that defendant has also forfeited this claim.

Trail was a police officer who had testified about his familiarity with the area around the shooting and with defendant and others. Late in the trial, Trail was cross-examined by defense counsel, who asked him if he had frequently seen David Trulove, defendant's brother, in the area. Trail indicated he had at times. A short time later, defense counsel asked if he could recognize David Trulove by sight.[10] Trail replied: "David Trulove and the defendant's brother, I had trouble distinguishing between the two. A lot of times, David, Daniel and Jamal would use each other's names when they got arrested, so it was difficult for me."
When defense counsel objected that the answer was "nonresponsive," the court sustained the objection, struck it from the record, and ordered the jury to disregard it.

As defendant points out, cases have held that a witness, such as a law enforcement officer, may engage in reversible misconduct by deliberately revealing inadmissible evidence, such as a defendant's inadmissible statement to police under circumstances suggesting a confession (*People v. Navarette* (2010) 181 Cal.App.4th 828, 834), or that a defendant was previously suspected of a crime that, given the prosecutor's other questions, may have been similar to that presently charged. (*People v. Bentley* (1955) 131 Cal.App.2d 687, 689-692, disapproved on another ground in *People v. White* (1958) 50 Cal.2d 428, 431.)

The People do not directly address defendant's argument that Trail's statement was so prejudicial as to require reversal, but argue defendant has forfeited all the claims in the section of his brief that includes a discussion of Trail's testimony, to the extent

---

**10** Defense counsel's question is curious, since Trail had just indicated he had seen David Trulove in the area at times. It is possible that the defense counsel intended one of his references to "David Trulove" to be a reference to another brother, Daniel Trulove.

defendant did not first raise a proper objection below. (*People v. Williams*, *supra*, 43 Cal.4th 584, 620; Evid. Code, § 353, subd. (a).) Defendant's only objection below was that Trail's statement was nonresponsive, not that it was prejudicial, and his failure to raise prejudice prevented the court from giving a more comprehensive admonition. Under these circumstances, we conclude he has forfeited his appellate claim. (*Williams*, at p. 620; Evid. Code, § 353, subd. (a).)

Therefore, we do not need to address the substance of defendant's claim. However, even if there were no forfeiture, we are not persuaded that any error was prejudicial under either the federal or state standard because Trail's statement was a solitary comment that did not refer to any previous acts of violence by defendant, the jury was already aware that defendant and brothers of his were at least persons of interest to police, since their mug shots were on the wall of the police station room where Lualemaga was taken on the night of the shooting, Lualemaga's firm identification of defendant as the shooter and the other evidence presented by the prosecution, and the court's admonition to the jury to disregard Trail's remark.

## V. *Prosecutorial Misconduct*

Defendant next argues that the prosecutor made numerous remarks in closing argument that constituted prosecutorial misconduct. Defendant claims the prosecutor violated defendant's federal constitutional rights by arguing facts not in evidence, vouching for evidence, and expressing her personal opinion of the evidence; improperly appealing to the jury's sympathy for Lualemaga and their fear of defendant; improperly disparaging the defense expert and investigator; and improperly misstating facts relevant to whether the shooter acted with premeditation and deliberation. He also argues that, to the extent we find he forfeited any of his claims by his counsel's failure to object, we should reverse because he received ineffective assistance of counsel.

The People argue that defendant has forfeited most of his claims and that there was no error. We again agree with the People.

**A.** *Forfeiture*

As the People point out, our Supreme Court has held that, when a defendant does not object to remarks in closing argument claimed to be prosecutorial misconduct, "defendant is deemed to have waived the objection and the point cannot be raised on appeal. [Citations.] The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.' " (*People v. Green* (1980) 27 Cal.3d 1, 27 (*Green*), overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 233-237 and *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3.) Thus, "the initial question to be decided in all cases in which defendant complains of prosecutorial misconduct for the first time on appeal is whether a timely objection and admonition would have cured the harm. If it would, the contention must be rejected[.]" (*Green*, at p. 34.) "[A] claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury." (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

Defendant argues that he preserved his objections via his motion in limine regarding Lualemaga's participation in the witness protection program; his objection at trial to evidence about Lualemaga's sister's participation in the witness protection program; and his objection to the prosecutor withholding documents regarding the details of payments to Lualemaga. He cites to *People v. Hill* (1998) 17 Cal.4th 800, which provides that "[a] defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile," that a failure to require the jury be admonished does not forfeit the issue on appeal "if ' "an admonition would not have cured the harm caused by the misconduct," ' " and that "the absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' " (*Hill*, at pp. 820-821, quoting *Green*, *supra*, 27 Cal.3d at p. 35, fn. 19.)

Defendant's preservation argument is unpersuasive. His appellate claims are not to the prosecutor's reference to the evidence he objected to, but to her purported misconduct in referring to these and other matters. None of this purported misconduct was a subject of defendant's motion in limine or any other objections, with the exception of one objection made during closing argument that we will discuss. Also, although we conclude that there was no misconduct, timely objections and requests for admonition would have cured any purported harm. Therefore, except as we discuss, *post,* defendant has forfeited his appellate claims of prosecutorial misconduct.[11]

## B. *No Misconduct*

Even if there was no forfeiture, we conclude the prosecutor did not engage in misconduct.

As the People point out, " '[a] prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.) " ' "Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 283-284.)

Generally, " ' " 'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." (*People v. Hill*, *supra*, 17 Cal.4th at p. 819.) " 'A prosecutor may "vigorously argue his case and is not

---

[11] Defendant also argues the trial court had a duty to rein in continued misconduct even absent adequate objection based on *People v. Vance* (2010) 188 Cal.App.4th 1182, 1201-1202, issued by this court. This argument is unpersuasive because we found in *Vance* that the trial court failed in its duty to admonish the jury *in the face of repeated objections by the defense*, which the court sustained. (*Ibid.*)

48

limited to 'Chesterfieldian politeness' " [citation], and he may "use appropriate epithets . . . ." ' " ' [Citation]." (*Ibid.*)  Also, "[a]lthough defendant singles out words and phrases, or at most a few sentences, to demonstrate misconduct, we must view the statements in the context of the argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

We note at the outset that defendant repeatedly singles out words, phrases, and sentences to argue that the prosecutor engaged in a plethora of misconduct, while not addressing the prosecutor's statements in context, recognizing the wide latitude to argue allowed under the law, or viewing the remarks as a part of the prosecutor's whole argument.  We have so viewed them, and conclude the remarks complained of were not misconduct.  The prosecutor extensively reviewed the evidence and urged the jury to carefully examine it before reaching a conclusion, including as follows:

"You have to go through all of the evidence, analyze all of it.  Didn't I tell you to analyze the defense evidence?

"I don't expect you to come to some snap judgment, even though I know you believe her.  It was some really compelling testimony, and that's why the defense is so worried about it.

"It's not my job to make it easy for you.  It's my job to give you the evidence.  And I asked you to do it in a certain way because, when you're done, after you've analyzed all of the evidence, I know that you will be comfortable knowing that you gave the defendant a fair trial.

"I'm not asking you to do this quickly.  I'm not asking you to do this the simple, easy way, not even talk about it or think about it.  I'm asking you to give the defendant a fair trial by carefully evaluating all of the evidence."

We now review each of defendant's claims.

**1.** *Claims Regarding Facts Not in Evidence, Vouching for Evidence, Personal Opinion of the Evidence*

Defendant first argues that the prosecutor repeatedly engaged in misconduct by referring to facts not in evidence, vouching for evidence, and giving her personal opinion of evidence.

As defendant points out, referring to facts not in evidence is " 'clearly misconduct' [citation], because such statements 'tend[] to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination. . . . 'Statements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal.' " (*People v. Hill*, *supra,* 17 Cal.4th at p. 828.)  Also, "the prosecutor has a special obligation to avoid 'improper suggestions, insinuations, and especially assertions of personal knowledge." (*United States v. Roberts* (9th Cir. 1980) 618 F.2d 530, 533, quoting *Berger v. United States* (1935) 295 U.S. 78, 88.)

As the People point out, "[a] prosecutor may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom." ' [Citation.]  But a 'prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record.' " (*People v. Turner* (2004) 34 Cal.4th 406, 432-433.)  Furthermore, a prosecutor is not permitted "to place the prestige of her office behind a witness by offering the impression that she has taken steps to assure a witness's truthfulness at trial.  [Citation.]  However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching." (*People v. Frye* (1988) 18 Cal.4th 894, 971, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421.)

### a. *Claims Regarding Facts Not in Evidence*

Defendant contends the prosecutor made a number of statements to the jury that indicated the danger to Lualemaga was real, which was not in evidence. For example, he cites the prosecutor's remark that "Lualemaga was the only witness willing to walk in here, *risk her life*, and tell you what she saw (italics added), and other similar remarks.

The People argue the prosecutor made the remarks in dispute to explain "why Lualemaga was not one hundred percent sure of her identification of [defendant] as the shooter when she talked to the police, but was one hundred percent sure at trial," as well as to explain Lualemaga's attitude towards testifying, particularly her fears about her own life and those of her family, her sister, and her sister's family. Thus, when the prosecutor said Lualemaga had risked her life and the lives of the others by coming forward as a witness, she "was telling the jury that there was no good reason for the witness to come forward unless she was telling the truth. Experiencing the fear of risking lives was not a good reason to be a witness. Whether expressed as fear or risk, the concept was clearly what the evidence showed." Therefore, there was no misconduct.

We agree with the People. The case involved evidence provided by a key witness, Lualemaga, whose identification of the defendant was stated with greater certainty after her early interview by police, and whose testimony at the preliminary hearing including an admitted falsehood. By Lualemaga's own account, these matters were explained by her own nervousness, fear, and even terror about what might happen to her if she testified as a witness against defendant. She testified that she was so fearful that she decided to enter into the witness protection program, and later requested that her sister be put into the program as well.

The prosecutor's argument to the jury was based on this evidence, and emphasized that Lualemaga was credible because she testified despite her perception of danger and her fear of what might happen to her. As we have discussed, evidence of Lualemaga's fearful state of mind was relevant to her credibility and properly admitted. (*People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1368.) Therefore, argument on this evidence was proper. Furthermore, evaluating the prosecutor's argument as a whole, we do not think

51

there is a reasonable likelihood that the jury construed her remarks as anything other than comments on this evidence.

Defendant also argues the prosecutor improperly told the jury that on the night of the crime, "[t]he police officer obviously recognized the danger [Lualemaga] was in," and stated her own opinion when she said that Lualemaga's "life *will* never be the same. *I don't think* she's ever going to have a day when she's not looking over her shoulder" and words to that effect. (Italics added.) Both comments were based on evidence as well. The prosecutor's reference to the "danger" Lualemaga was in on the night of the shooting was a fair comment on the evidence. The record indicates that there were many people around when the police arrived and began asking for witnesses; it is a reasonable inference that a person seen cooperating with the police in that context might face danger if the perpetrator learned of that person's cooperation, whoever the perpetrator might be.

It was also appropriate for the prosecutor to infer from Lualemaga's testimony that she would continue to be fearful into the future. While the prosecutor used inartful language ("I think") in making this inference, we do not find this to be an improper statement of personal opinion in light of the extensive evidence of Lualemaga's ongoing fear and the otherwise wide latitude we allow in closing argument.

### b. *Claims Regarding Vouching*

Defendant next argues the prosecutor inappropriately and repeatedly vouched for her own office's role in relocating Lualemaga, her sister, and her sister's family, and in taking extraordinary measures needed to keep Lualemaga "safe" from danger. Representative of the remarks he highlights was the prosecutor's remark, "*So we move her* into a hotel. And *we put her in a safe place*." (Italics added.)

We conclude that these comments, viewed in context, are also fair comments on the evidence. Contrary to defendant's contention, the evidence *did* indicate that the district attorney's office had been responsible for the witness protection program. Lualemaga testified that "Mr. Fleming" discussed the possibility of her going into the program just before the preliminary hearing, and indicated elsewhere that Fleming was the assistant district attorney handling the case prior to the prosecutor who tried it.

Lualemaga also answered affirmatively when the prosecutor asked, "Have *we* been able to put your sister in a safe place before she testified today?" This indicated the district attorney's office also placed her sister's family in the witness protection program. (Italics added.)

The evidence also indicated that Lualemaga was moved multiple times while in the program, and that she remained fearful. The prosecutor also made fair comments on this evidence. She used inartful language here and there, such as stating, "How do you keep a witness safe?" Nonetheless, her argument was directed at what steps were taken to make Lualemaga feel *emotionally* safe; again, her fear and sense of safety were important issues in evaluating her credibility in light of the changes in her account over time. Reviewing the prosecutor's remarks in context, we do not think there was a reasonable likelihood that the jury construed these remarks as referring to anything else.

### c. *Claims Regarding the Prosecutor's Personal Opinion*

Defendant also argues the prosecutor improperly stated her personal opinion of Lualemaga's credibility when she stated to the jury, "I know you believe her," and "I know that you know that she was telling the truth." Again, defendant is taking the prosecutor's language out of context. In fact, the prosecutor made the first statement in the course of urging the jurors to consider all of the evidence. Again, wide latitude must be afforded in argument, and the prosecutor's statements appropriately related to Lualemaga's credibility.

Defendant also argues that the prosecutor improperly suggested to the jury that there were other witnesses who could have implicated defendant. For example, he points out that the prosecutor told the jury that "[a]ll those people who saw, and only one person came forward," and that Lualemaga was "the only witness willing to come forward; the only witness willing to walk in here, risk her life, and tell you what she saw." The prosecutor's remarks were proper argument based on the evidence. Lualemaga testified that about 25 other people were outside at the time of the shooting, and backed away when it occurred, from which it can be inferred that others saw the shooting. The

53

prosecutor did not suggest that another witness could have implicated defendant specifically.

### 2. *Claims of Appealing for Sympathy for Lualemaga*

Defendant next argues that the prosecutor "committed misconduct by repeatedly appealing [to] the jurors' sympathy for Lualemaga, and repeatedly asking the jurors to put themselves in Lualemaga's position." Again, we disagree.

As defendant points out, and as summarized by this court in *Vance*, *supra*, 188 Cal.App.4th 1182, it is " ' "improper to make arguments to the jury that give it the impression that 'emotion may reign over reason,' and to present 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response.' [Citation.]" ' [Citation.] 'It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial.' " (*Id.* at p. 1192.)

Thus, so-called "Golden Rule" arguments during the guilt phase of a case are improper. (*Vance*, *supra*, 188 Cal.App.4th at pp. 1192-1193.) That is, " 'it is misconduct for a prosecutor to appeal to the passions of the jurors by urging them to imagine the suffering of the victim. . . . "We have settled that an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt." ' " (*Id.* at p. 1192.) "The condemnation of Golden Rule arguments in both civil and criminal cases, by both state and federal courts, is so widespread that it is characterized as 'universal.' " (*Id.* at p. 1198.)

Defendant, relying on *Vance*, *supra*, 188 Cal.App.4th at page 1193 and other case law (see *People v. Herring* (1993) 20 Cal.App.4th 1066, 1074-1076 (*Herring*)), argues the Golden Rule extends to members of the victim's family and to eyewitnesses, and that Lualemaga belonged in both categories. He also argues the prosecutor's references to Lualemaga's fears about the safety of her sister and her sister's family were attempts to invoke sympathy for the family of the victims.

Defendant further argues that, given Lualemaga's status (and that of her sister and her sister's family), the prosecutor made numerous statements that asked the jurors to put themselves in Lualemaga's position, and amounted to misconduct. For example, the prosecutor told the jury, "[Lualemaga's] life is priceless to her. Priceless. What is your life worth to you? What would you risk your life for?" When a defense objection to this was sustained—the one objection made in closing argument by the defense to the prosecutor's remarks, the prosecutor continued, "What would people give up? What would people risk their life for . . . . [¶] You can't underestimate the sacrifice that [Lualemaga] has made."

Representative of the other remarks defendant highlights were the prosecutor's remarks, "[h]ow would *you* like to be the woman who raises her child in a hotel room" and "how sure would *you* have to be before *you* would risk *your* life on it?" (Italics added.) According to defendant, this type of argument had an "unusually potent prejudicial impact" (*Vance*, *supra*, 188 Cal.App.4th at p. 1199) and, in this "close case," was "undoubtedly prejudicial."

We disagree with defendant's analysis for two reasons. First, although Lualemaga testified at one point that she was a distant relative of Kuka, who was the half brother of Lualemaga's father's half sister, the prosecutor did not argue this point in her closing argument. Rather, the prosecutor's comments were directed at Lualemaga's role as an eyewitness in the case.

Second, defendant does not cite any case discussing the "Golden Rule" that indicates a prosecutor is prohibited from making the remarks complained of here regarding an *eyewitness's* credibility. The prosecutor's remarks were made as part of an argument to the jury that Lualemaga was a credible eyewitness who, although afraid and believing that she was putting her life at risk, had stepped forward to testify. Defendant does not explain why the Golden Rule should apply to such circumstances, and we conclude that it does not. We do not read the remarks complained of as an attempt to evoke sympathy for Lualemaga as an eyewitness but, instead, as an effort to emphasize the fears she had experienced and hardships she had endured in order to testify, which, as

55

we have already discussed, were fair matters to comment on based on the evidence. We also conclude that there was not a reasonable likelihood that the jury construed these remarks otherwise. Thus, even though the defense objection was sustained by the court to one of the prosecutor's remarks, we conclude the prosecutor did not engage in misconduct in that or the other instances.

Defendant also argues the prosecutor engaged in misconduct by encouraging the jury to allow its emotions to reign over its reason regarding Lualemaga. According to defendant, "the prosecutor repeatedly urged the jurors to base their verdicts on their sympathy for Lualemaga, in particular what the jurors 'felt' about her. She urged them, 'the evidence speaks to you. You saw her. *You felt it in your hearts*. You know it in your heads.' The prosecutor repeated, 'You know you believe her, . . . you *felt it in your heart*. I know that you know that she was telling the truth.' "

We reject this argument as well. The prosecutor was not asking the jurors to consider emotion over reason—indeed, she referred at the same time to jurors knowing "in their heads" that Lualemaga was telling the truth as well. Our Supreme Court has noted, "Oral testimony of witnesses given in the presence of the trier of fact is valued for its probative worth on the issue of credibility, because such testimony affords the trier of fact an opportunity to observe the demeanor of witnesses. [Citation.] A witness's demeanor is ' "part of the evidence" ' and is 'of considerable legal consequence.' " (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1358.) The court further acknowledged, quoting from *Meiner v. Ford Motor Co.* (1971) 17 Cal.App.3d 127, 140-141, " '[o]ne who sees, hears and observes [a witness] may be convinced of his honesty, his integrity, [and] his reliability . . . because a great deal of that highly delicate process we call evaluating the credibility of a witness is based on . . . "intuition[.]" ' " (*Elkins*, at p. 1358.) Viewed in context, and affording wide latitude for argument, we conclude the prosecutor's references to the juror's hearts were references to their intuition about Lualemaga's testimony, not appeals to allow emotion to reign over reason, and that there was not a reasonable likelihood that the jury construed these remarks otherwise.

**3.** *Claims the Prosecutor Appealed to Jurors' Fear of Defendant*

Defendant further argues the prosecutor committed misconduct by appealing to the jurors' "fear[s] and prejudices by suggesting that a vote to convict on the basis of the testimony of one witness was an act of 'courage' rather than [a] reasoned analysis of the evidence, and that the jury should consider the impact of their verdict on society at large." Again, we disagree, taking the prosecutor's closing argument as a whole.

Specifically, defendant contends that the prosecutor committed misconduct throughout much of the first part of her closing argument. After the prosecutor referred to her questions in voir dire about whether jurors could convict someone on the basis of the testimony of one witness, the prosecutor not only reminded the jury that this was the law, but also said she wanted the jury "to have the courage of your convictions. I want you to believe it. So let's talk about this concept of one witness. Are we prepared, as a society, to say we need more? That you can't base a criminal conviction on just one witness?" After referring to rape and domestic violence cases, she argued:

"We're not prepared to say people can get away with rape and domestic violence, and even murder, just because there's only one witness.

"You know what would happen if that were the rule. You know how many witnesses would get intimidated or murdered.

"You know it doesn't make sense. And you know the rule makes sense that you can prove a fact, even a whole criminal conviction, based on the testimony of one witness.

"Let's think this through even further. What do you expect the police to do? What happens when they show up in the projects and there's dozens of people there and the police say, 'Hey, did anyone see what happened.' And everybody turns their back, walks away. Everybody shakes their head.

"What happens if one courageous person steps forward, just one? What do you want the police department to do?

"Do you want them to say, 'Oh, there's only one witness.  Why don't we just close that file, because the jury is not going to buy this.  It's just not enough.  We're going to let those criminals go free?

"You know you wouldn't do that.  You know that's not what you expect the police to do.

"What do you expect the district attorney's office to do when the police bring them a case and say, 'Hey, only one person came forward.  We only have one witness.'

"What do you want the DA's office to do?  Do you want us to say, 'Hey, you know what?  It's not worth it.  We're going to let somebody get away with the crime.'

"You know this makes sense.  It's not just that this is the law.  It's that you believe in it.  The whole principle behind this makes sense.  People can't get away with crimes just because witnesses are afraid to come forward."

Defendant contends the prosecutor continued this line of purportedly improper argument and appealed to the jurors' fears when she said, "[W]e can't let murderers go free, simply because twelve jurors are afraid to do together what one witness did alone." He contends the prosecutor made a similarly improper appeal to jurors' emotions at the close of her remarks, when she said, "[Y]ou can't be afraid," and "[n]ow I'm asking you to have the same courage that [Lualemaga] did and convict the defendant of murder."

In his reply brief, defendant also argues that a recently published Ninth Circuit case leaves no doubt that the prosecutor's "appeals to the social ramifications of an acquittal" require reversal here.  In *United States v. Sanchez* (9th Cir. 2011) 659 F.3d 1252 (*Sanchez*), the defendant, Sanchez, was on trial for importation and possession of cocaine, having been arrested at a California port of entry from Mexico after cocaine was found in hidden compartments in his car.  (*Id*. at p. 1254.)  Sanchez made statements at the port of entry indicating he wanted help because of a concern for his family's safety, but he did not explain why.  (*Id*. at p. 1255.)  At trial, he testified that he had acted under duress because drug traffickers had threatened his family if he did not drive the vehicle, and did not go to the Mexican police because they "were corrupt and in the pocket of the drug traffickers."  (*Ibid*.)

58

At the end of his rebuttal, the prosecutor, referring to Sanchez's duress claim, said, "[W]hy don't we send a memo to all drug traffickers, to all persons south of the border and in Imperial County and in California—why not our nation while we're at it. Send a memo to them and say dear drug traffickers, when you hire someone to drive a load, tell them that they were forced to do it. Because . . . they'll get away with it if they just say their family was threatened. Because they don't trust Mexican police, and they don't think that the U.S. authorities can help them. Why don't we do that?" (*Sanchez*, *supra*, 659 F.3d at p. 1256.) There was no objection by the defense, and the court then sent the jury off to deliberate. (*Id*. at pp. 1256, 1257.)

The *Sanchez* court found the prosecutor had engaged in misconduct. It noted that prosecutors " 'may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence.' " It concluded the prosecutor's "send a memo" statement was improper because "the prosecutor was encouraging the jury to come to a verdict based not on Sanchez's guilt or innocence, but on the 'potential social ramifications' of the verdict." (*Sanchez*, *supra*, 659 F.3d at pp. 1256-1257.) The *Sanchez* court found the prosecutor's statement to be prejudicial, even in the absence of a defense objection, in significant part because the strength of the government's case rested on Sanchez's credibility. (*Id*. at pp. 1257-1261.) It reversed Sanchez's conviction and remanded the matter for a new trial. (*Id*. at p. 1261.)

Defendant argues that the prosecutor's argument in the present case was even more egregious than that in *Sanchez* because she "repeatedly appealed to the jurors to base their verdict on the larger social ramifications of a not guilty verdict which would lead police and prosecutors to reject cases with one witness, and would let rapists, murderers and wife-beaters go free to prey upon their neighbors and families, and to intimidate and murder witnesses." Defendant contends that, as in *Sanchez*, the prosecutor commented not on the evidence, but instead made a "policy argument against acquittal" that "rais[ed] the specter of future law-breaking to divert the jury from its obligation to

reach a verdict based only on the evidence." (*Sanchez, supra*, 659 F.3d at p. 1259.) Furthermore, similar to the circumstances in *Sanchez,* "the sole issue was Lualemaga's credibility."

Once more, we disagree with defendant's analysis. The purpose of the prosecutor's argument was significantly different than that given in *Sanchez*. Most of the prosecutor's remarks complained of here were at the beginning (rather than the end) of a much larger closing argument, in which she extensively discussed the evidence of the case and urged the jury to consider this evidence. The prosecutor opened her remarks with a reminder to the jury that the law allowed it to convict a person of murder based on the testimony of just one witness. The prosecutor's remarks about the "social ramifications" of relying on one witness did *not* exhort the jury to find defendant guilty; instead, the prosecutor explained the policy behind the "one witness" rule and exhorted the jury to *follow the law*. Thus, viewing the prosecutor's presentation as a whole, the first part of her closing argument was not an appeal to the jury to convict defendant based on the social ramifications of an acquittal or for fear of what might otherwise occur, but instead to rely on Lualemaga's testimony, *if they found it credible*—a subject the prosecutor went on to discuss later in her closing argument—*even if she were the only witness to the crime*. We find no misconduct in this approach.

Nor are we concerned that the prosecutor's remarks inappropriately appealed to the jury's emotions. Defendant again takes them out of context. As we have discussed, the prosecutor urged the jury to decide the case on the evidence, and discussed the evidence at length. Giving wide latitude we must afford for argument, we see no error in the prosecutor's remarks when viewed in the context of her entire closing argument.

**4.** ***Claims Regarding Disparaging the Defense Expert and Investigator***

Defendant next argues the prosecutor engaged in misconduct by disparaging the defense expert and investigator and, by implication, defense counsel.

As defendant correctly points out, "[t]he unsupported implication by the prosecutor that defense counsel fabricated a defense constitutes misconduct." (*People v. Bain* (1971) 5 Cal.3d 839, 847 (*Bain*).) Furthermore, "[i]t is improper for the prosecutor

to imply that defense counsel has fabricated evidence or to otherwise malign defense counsel's character." (*Herring*, *supra*, 20 Cal.App.4th at p. 1075.) "Casting uncalled for aspersions on defense counsel directs attention to largely irrelevant matters and does not constitute comment on the evidence or argument as to inferences to be drawn therefrom." (*People v. Thompson* (1988) 45 Cal.3d 86, 112.)

According to defendant, the prosecutor first engaged in misconduct in her cross-examination of the defense investigator, Heriot. The prosecutor asked a few questions which were objected to as argumentative by defense counsel, which objections the court sustained. These were, "[w]hen you were retained by [defense counsel], you were retained to help him get the defendant off of murder, is that right"; that the investigator was not "retained to make [defense counsel's] job harder, were you"; and, after the investigator indicated he has investigated 3.000 cases, including 50 homicides, "[s]o you've been retained by defense attorneys who are representing 50 murderers?" Defendant suggests that a juror question of Heriot, which asked if it was true that he "became frustrated when asked about being paid," indicated these questions left a negative impression on that juror. However, defendant fails to establish that any of these statements rose to a level of prosecutorial misconduct. We have no reason to conclude that they did. In any event, as we have already indicated, defendant has forfeited his appellate claims regarding them by failing to object on the grounds he raises on appeal.[12]

Defendant also complains of various statements made by the prosecutor in closing argument. The prosecutor contended that there was a "difference between people who

_____

[12]  In his reply brief, defendant also argues that even though the trial court sustained his objections, the prosecutor "continued with objectionable arguments in closing; this suggests that any further defense objection should be excused as futile or that the objections are preserved because the trial court failed to rein in the misconduct," citing *People v. Hill*, *supra*, 17 Cal.4th at pages 820-822 and *Vance*, *supra*, 188 Cal.App.4th at pages 1201-1202. We do not agree. The objections to cross-examination questions sustained by the court were to their argumentative nature, which defendant does not raise on appeal. We fail to see how objections to argument would have been futile under this circumstance or why the court would have an obligation to act sua sponte based on the case law cited by defendant.

are simply witnesses because they did something in the case before the trial, somehow they were involved . . . and people [who] are retained just to do some work for one side or the other." She then talked about the prosecution witnesses. Defendant quotes, with the italics we have included, the prosecutor's statement that Lualemaga "wasn't hired to come in and tell you something. She *wasn't hired to make up some facts*. She *wasn't hired to give you an opinion.*" He also points to the prosecutor's statements that Officer Trail was not hired to testify or gather the information he provided at trial, Officer Altamirano was not "one of these paid witnesses," Inspector Evans was "not a hired, paid witness," and the medical examiner, Dr. Moffatt, "wasn't a hired paid witness." Defendant also refers to the prosecutor's comment about criminalist Smith that he was "[n]ot a hired, paid witness. *Nobody retained him, just so he could come in here and tell you something.*" (Italics added.)

Defendant then argues that the prosecutor "disparaged the defense witnesses as hired to give favorable opinions to the defense." He cites to the prosecutor's statement that Heriot was hired to work with the defense, and that he was a witness "who create[s] the illusion of a bigger defense than there [is] . . . ." He also highlights the prosecutor's statement that Loftus was "retained by the defense to tell you something. . . . He was paid specifically to give opinions that would be helpful to the defense." He claims the prosecutor disparaged Loftus and defense counsel by suggesting that Loftus gave the jury "irrelevant opinions" that "distracted from the real facts of this case," was trying to "distract" the jury's attention, "fluff up the defense," and "confuse" the jury. Finally, defendant protests the prosecutor's statement that the defense attempted to mislead the jury by showing the crime scene video, in order to have the jury "think it was darker than it really was, so that you would think [Lualemaga] couldn't see what she saw."

Defendant argues that these arguments were misconduct, and "indistinguishable" from that found in *Bain* and *Herring*. We disagree. Although the People do not discuss these cases, we have found in our own independent research that our Supreme Court later characterized the misconduct discussed in those cases as "extreme instances of

prosecutorial misconduct." (*People v. Gionis* (1995) 9 Cal.4th 1196, 1220 (*Gionis*).)
The *Gionis* court summarized them as follows:

"In *People v. Herring*, *supra*, [20 Cal.App.4th at page 1075], the prosecutor argued: ' "[m]y people are victims. His people are rapists, murderers, robbers, child molesters. He has to tell them what to say. He has to help them plan a defense. He does not want you to hear the truth . . . ." ' [Citation.] In effect, the argument accused defense counsel of suborning perjury and implied that defense counsel did not believe his own client. It also implied that all those accused of crimes whom defense counsel represented were necessarily guilty of heinous crimes. [Citation.] Similarly, in *Bain*, *supra*, [5 Cal.3d at pages 845-846] the prosecutor not only asserted that defendant and his counsel had fabricated a defense, but he also attacked the integrity of counsel and the office of the public defender. Additionally, the prosecutor referred repeatedly to racial matters, stating at one point that he, as a Black man, would not be prosecuting a Black defendant unless he personally believed the man to be guilty." (*Gionis*, *supra*, 9 Cal.4th at p. 1220.)

The *Gionis* court concluded that the case before it bore no resemblance to *Herring* or *Bain*. (*Gionis*, *supra*, 9 Cal.4th at p. 1220.)[13] We reach the same conclusion here. Defendant's argument is again based on taking the prosecutor's remarks out of context. He claims that the prosecutor suggested that defense witnesses were hired to "make up some facts," but the only thing the prosecutor said in this regard was that Lualemaga was *not* hired to do so, a comment the prosecutor made before discussing the defense witnesses. The prosecutor's comment about Lualemaga was not inaccurate and she did not say the opposite was true of defense witnesses. Therefore, it was not misconduct.

As for the remainder of the comments complained of, we conclude, giving the wide latitude we must afford, that they were proper argument. The evidence indicated that the defense witnesses were retained to testify on behalf of the defense. The

---

[13] The *Gionis* court did conclude that one remark by the prosecutor was improper, a "quotation referring to the duty of an attorney to lie, conceal, distort and slander," but that it was adequately dealt with by the court's admonition. (*Gionis*, *supra*, 9 Cal.4th at p. 1221.) This statement is far more egregious than anything cited by defendant in the present case.

63

prosecutor's contention that Heriot's testimony created an illusion about the size of the defense was said as part of the prosecutor's argument that Heriot's testimony added little to the defense other than increasing the number of witnesses the defense presented. We see no reason why this was improper.

The prosecutor's comments about Loftus were also proper. The prosecutor's remark about his role as a paid defense witness and the relevance of his opinions were made in the context of arguing to the jury that Loftus had never met anyone in the case or been to the scene, and had "fluff[ed] up the defense" by spending "so much time talking to you about experiments that have nothing to do with a witness who knows the perpetrator." This was an arguably accurate characterization of the evidence: whatever Loftus's testimony indicated about ways in which a person's memories could be distorted, there was no evidence that Lualemaga did anything other than recognize defendant, a person she had seen about 30 times before in the neighborhood, when he appeared on the scene under the streetlight by her car. While it was fair for the defense to argue that Lualemaga's memories were distorted, it was equally fair for the prosecution to comment on the speculative nature of such theories.

Similarly, although the prosecutor could have chosen better words when she said showing the crime scene video to the jury was an effort by the defense to "mislead" the jury into thinking the scene was darker than it really was, given the wide latitude we afford to argument, we conclude this was not misconduct either.

In other words, the prosecutor was arguing that Heriot and Loftus were hired witnesses whose testimony was not relevant to the issues at hand and intended to confuse the issues, not that there was some deliberate attempt to fabricate a defense or deceive the jury, and there is not a reasonable likelihood that the jury would have understood them otherwise. Under these circumstances, the prosecutor's remarks were not misconduct, as our own research indicates. (See *People v. Bell* (1989) 49 Cal.3d 502, 538 [not improper to argue to the jury that commonly it was defense counsel's " 'job' " to focus on areas " 'which tend to confuse,' " it was defense counsel's job to " 'throw sand in your eyes,' " and that he " 'wants to confuse you' "]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1081-

1082 [fair for the prosecutor to comment on speculative testimony that defendant could have been under the influence of PCP that, " 'I talked to you earlier about dazzling, you know, dazzle you with BS. Well, they can baffle you with BS; and that's what they're trying to do. They're trying to baffle you with the red herring, PCP' "]; *People v. Breaux* (1991) 1 Cal.4th 281, 305 [finding it proper for the prosecutor to remark that law students are taught " 'that if you don't have the law on your side, argue the facts. If you don't have the facts on your side, argue the law. If you don't have either one of those things on your side, try to create some sort of confusion with regard to the case because any confusion at all is to the benefit of the defense' "]; *People v. Frank* (1990) 51 Cal.3d 718, 736-737 [no misconduct for the prosecutor to refer to one expert witness as " '*just a hired opinion*' "]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1302, fn. 47 ["[a]n argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper"].)

Finally, defendant argues that "the whole premise of the prosecutor's argument—that the prosecution witnesses were not hired to investigate and testify for the state is false" because Moffatt, with inspectors and uniformed officers, returned to the scene of the incident after testifying, then provided additional testimony the next day. Defendant contends this showed these officials were at the prosecutor's "beck and call at nighttime during trial to prepare additional testimony in support of the prosecutor's presentation of her case." We disagree. The record shows that, aside from Moffatt's additional testimony, the prosecution witnesses testified about matters that they encountered during their performance of their duties or, in the case of Lualemaga, that she witnesssed, and not about matters for which they were retained to testify. Defendant's reference to one episode as proving the "whole premise" of the prosecutor's argument was false is unpersuasive.

65

### 5. *Claims Regarding Misstating Facts*

Defendant next asserts that the prosecutor committed misconduct by misstating the facts about the shooter's conduct after firing the initial shots that sent Kuka to the ground, part of the prosecutor's argument for why defendant had committed first degree murder.

As defendant correctly points out, "[a]lthough prosecutors have wide latitude to draw inferences from the evidence presented at trial, mischaracterizing the evidence is misconduct. [Citations.] A prosecutor's 'vigorous' presentation of facts favorable to his or her side 'does not excuse either deliberate or mistaken statement of fact.' " (*People v. Hill*, *supra*, 17 Cal.4th at p. 823.) However, as is also stated in *Hill*, " ' " [t]he argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*Id.* at p. 819.)

Defendant focuses on the following portion of the prosecutor's closing argument, which he quotes with the italics that we have included as well, which are not in the reporter's transcript:

"Do you remember what [Lualemaga] said? Shoots him; [Kuka] goes down to his knees, falls on his face; and *then the defendant goes up to* [*Kuka*] . . . .

"What do you think he's thinking now? 'Oh, let me check him to see if he's okay?' No. What did he do next? He shot him some more.

"What do you think is going through his head *when he takes those steps*, when he first fired the shot that took down [Kuka] to *when he walked up next to him and pulled the first shot that entered his head?*

"What do you think he's thinking? 'I want you dead. Trying to kill you.' That's the only possible explanation.

"*Then he shoots him six times in the head. Six more times.* [¶] ( . . . [emphasis added])."

Defendant contends these remarks were misconduct because they did not accurately summarize Lualemaga's or any other testimony. Lualemaga, defendant contends, testified only that the shooter shot Kuka at least twice in the back, whereupon Kuka fell to the ground, and further testified, "Then [defendant] kept shooting him" in the

66

back.  Thus, defendant argues, there was not testimony about the shooter "walking" up to Kuka, "taking those steps," or standing over Kuka and firing into his head, as the prosecutor argued.

We conclude the prosecutor's remarks were a fair comment on the evidence, including reasonable inferences that could be drawn from it.  Defendant ignores the prosecutor's remarks just prior to the argument we quote directly above.  First, she referred to Moffatt's testimony that "the victim was shot three times in the back, six times in the head."  This was supported by evidence.  As we have discussed, the assistant medical examiner, Moffatt, testified that Kuka was shot twice in the back, once in the neck, and six times in the head, that she found two entrance wounds had stippling around them, which indicated they were inflicted at close range, and that, in her opinion, the wounds in the back were probably inflicted before the wounds to the head because the latter would be more quickly fatal.

From Moffatt's testimony it was fair for the prosecutor to argue that Kuka had been shot six times in the head, and that these were the last shots fired, at close range.  Further, as the prosecutor stated a short time later, it was reasonable to infer from the evidence that the shots to the head were fired at close range "[b]ecause how do you hit your target six times without being close enough to do it?"

This leaves defendant's contention that the prosecutor committed misconduct by referring to the shooter taking "steps" up to the fallen Kuka before firing these six shots to the head.  We conclude the prosecutor could reasonably infer from the evidence that the shooter stepped towards Kuka after he fell.  Specifically, Lualemaga testified that defendant "ran after" Kuka and "shot [Kuka] in the back" when "[h]e was right behind him," as Kuka was running.  The following exchange then occurred:

"Q.  After you saw [defendant] shoot [Kuka], what happened to [Kuka]?

"A.  [Kuka] dropped to his knees, and he fell forward on his face.

"Q.  Did that happen right away?

"A.  Yes.

67

"Q. And how many times did [defendant] shoot [Kuka] before [Kuka] went down, do you remember?

"A. It had to be two times, maybe. I mean, if you get it in back with a gun, wouldn't you fall?

"Q. So you saw [Kuka] fall down?

"A. Yes.

"Q. Then what happened?

"A. Then [defendant] kept shooting him."

From Lualemaga's testimony, and from Moffatt's testimony that the shots to the head were fired last, it was reasonable to infer that a running Kuka fell forward on his face, and that defendant took steps towards Kuka to fire the six shots to Kuka's head. Therefore, the prosecutor did not engage in any misconduct.

Given our conclusion, we do not address defendant's arguments that he received ineffective assistance of counsel by his counsel's failure to object. We also do not address the parties' debate over whether the purported misconduct was prejudicial, including in its cumulative effect.

## VI. *There is Insufficient Evidence of First Degree Murder*

Defendant next argues the evidence was constitutionally insufficient to support his first degree murder conviction and it must be set aside. The People disagree, arguing substantial evidence indicated Kuka died from multiple gunshot wounds during a sequence in which defendant could have desisted before killing him, evidencing a willful, deliberate, and premeditated killing.

We conclude there was a lack of evidence of premeditation and deliberation and, therefore, insufficient evidence of first degree murder. Pursuant to sections 1181, subdivision 6 and 1260, we modify the judgment to reduce defendant's murder conviction from first to second degree.

### A. *The Relevant Proceedings Below*

At the close of trial, the court instructed the jury on premeditation and deliberation pursuant to CALCRIM No. 521, as follows: "The defendant acted deliberately if he

68

carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. [¶] The defendant acted with premeditation if he decided to kill before committing the act that caused death. [¶] The length of time a person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person, and according to the circumstances. [¶] A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated. [¶] On the other hand a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. All other murders are of the second degree."

After three days of deliberation, the jury asked the court: " 'Does first degree murder require that the act be willful, deliberate, and premeditated before the first shot was fired, or could it become willful, deliberate, and premeditated with any subsequent shot?' "

The trial court provided counsel with *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*) and asked how it should respond to the jury's question. The prosecutor argued the three *Anderson* categories of evidence show "courts allow the juries to consider not only evidence that occurs before the act of killing, but evidence that occurs during the act of killing" and, therefore, the jury could consider subsequent acts. Defense counsel agreed and asked that the jury be told proof must be beyond a reasonable doubt.

Relying on *Anderson*, the court concluded that the "evidence that has come out in the course of this case includes that the shooter [was] alleged to have shot the victim in the back; that then the victim goes face-first to the ground; and then the shooter goes up to the victim at that point and shoots another, I believe, six times, having shot three times in the back, then shoots six times into the victim's head." Quoting *Anderson*, the court held the nature of the killing was sufficient evidence "from which the jury could infer that the manner of killing, was so particular and exacting that the defendant must have intentionally killed according to a preconceived design to take his victim's life in a particular way." Defense counsel said the court's statement of the evidence was not the

69

only consistent inference that could be drawn, but did not object to the court's subsequent instruction.

That instruction was: "(1) Please review Instruction #521 in its entirety. [¶] (2) A finding of first degree murder does not require that the People prove that the defendant acted willfully, deliberately, and with premeditation before firing the first shot. It requires that the People prove he acted willfully, deliberately, and with premeditation before committing the act that caused death. The People must prove this beyond a reasonable doubt." Within a few hours, the jury returned a verdict that defendant was guilty of first degree murder.

In his new trial motion and in his sentencing memorandum, defendant requested a reduction to second degree murder. The trial court denied these requests, finding that "[t]he sequence and scenario that we have here was three shots fired into the back, and six shots fired into the head, after the victim was on the ground. [¶] That combination of factors and the fact that he died from multiple gunshot wounds, the court does not see any grounds on which to reduce this to second degree murder and declines to do that."

## B. *Analysis*

In reviewing a challenge to the sufficiency of the evidence, our role is a limited one. "[W]e review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*).)

The prosecution alleged defendant committed first degree murder because his killing Kuka was willful, deliberate, and premeditated (see § 189), and the jury agreed. " '[W]e need not be convinced beyond a reasonable doubt that defendant premeditated the murder[ ]. The relevant inquiry on appeal is whether " '*any* rational trier of fact' " could have been so persuaded.' " (*People v. Wharton* (1991) 53 Cal.3d 522, 546.) Reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*Bolin*, *supra*, 18 Cal.4th at p. 331; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11

70

[indicating the federal standard is the same].) "Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom." (*People v. Dooley* (2010) 189 Cal.App.4th 322, 326.)

Defendant argues there was insufficient evidence of premeditation and deliberation. *Anderson*, *supra*, 70 Cal.2d 15 provides that evidence sufficient to sustain a finding of premeditation and deliberation falls into three basic categories. They are: "(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; [and] (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id*. at pp. 26-27.)

From our independent research, we understand that *Anderson* does not require that the factors it discussed, planning activity, motive, and manner of killing, "be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive. *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." (*People v. Pride* (1992) 3 Cal.4th 195, 247.)

Furthermore, "[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way. [Citation.] *Anderson* identifies categories of evidence relevant to premeditation and deliberation that [courts of review] 'typically' find sufficient to sustain convictions for first degree murder." (*People v. Thomas* (1992) 2 Cal.4th 489, 517.) "Thus, while premeditation and deliberation must result from ' "careful thought and weighing of considerations" ' [citation], we continue to apply the principle that '[t]he process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citations.]' " (*Bolin*, *supra*, 18 Cal.4th at p. 332.)

Defendant contends there was insufficient evidence of first degree murder because the evidence shows only that Kuka was shot multiple times in rapid succession. He asserts, "There was no evidence of planning here, and the motive developed quickly as a response to Kuka chasing Bradley and knocking down the shooter." Also, defendant contends, "there was no evidence of a break between shots, no evidence that the shooter walked up to Kuka after first knocking him to the ground, and no evidence that the shooter stood over the victim while firing six additional shots to the head. Rather, Lualemaga testified that the shots 'happened so fast' that she was not even sure of the total number of shots." Therefore, there was no time for reflection between shots.

The People concede the evidence could have been interpreted in a manner inconsistent with first degree murder. Nonetheless, they argue substantial evidence supported the verdict because "the evidence can be interpreted to show that the victim died from multiple gunshot wounds during the sequence of which appellant could have desisted before killing the victim. Instead appellant continued to fire at the victim after he was on the ground, shot him at close range, and executed him willfully, deliberately,

and with premeditation. . . . It cannot be said that under no hypothesis was the evidence sufficient."

We agree with most, but not all, of defendant's argument. Contrary to his contentions, and as we have discussed, it can be reasonably inferred from the evidence that defendant, after shooting Kuka in the back, which caused Kuka to fall to the ground face down, took steps towards him and shot him six times in the head at close range. However, we otherwise agree with defendant's characterization of the evidence or, more to the point, the lack of it.

As the *Anderson* court and its progeny indicate, to affirm a first degree murder conviction, we must find more than substantial evidence of the willful intent to kill; we must also conclude that a reasonable juror could find there was evidence beyond a reasonable doubt that defendant acted with premeditation and deliberation, essential elements of first degree murder under the People's theory. (§ 189; see *Bolin*, *supra*, 18 Cal.4th at p. 331.) Typically, the manner of killing does not alone establish first degree murder. As defendant points out, "[i]t is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation. 'If the evidence showed no more than the infliction of multiple acts of violence on the victim, it would not be sufficient to show that the killing was the result of careful thought and weighing of considerations.' " (*Anderson*, *supra*, 70 Cal.2d at pp. 24-25.)

Lualemaga's sparse testimony was the only account presented at trial about defendant's conduct prior to and during the shooting. She said defendant was friends with Kuka, and present outside her building drinking with him and Bradley around 3:00 p.m. on the day of shooting. When Lualemaga looked out her bedroom window around 11:00 p.m. that night, she first saw defendant by her parked car when Kuka bumped into him as defendant "was kind of in his way." Kuka elbowed defendant "really hard" with his right arm, causing defendant to fall down, and then ran down a hill after Bradley. Lualemaga did not indicate defendant was holding a pistol when he first appeared, or took any aggressive action towards Kuka before being knocked down. While one could speculate about defendant's appearance, no juror could reasonably conclude beyond a

73

reasonable doubt that defendant's appearance on the scene indicated any planning or motive to kill Kuka.

Indeed, the People do not point to any specific, substantial evidence of planning. One could point to the fact that defendant arrived at the scene with a loaded pistol. However, without any evidence of the reason why, no juror could reasonably conclude beyond a reasonable doubt that defendant planned to kill Kuka when he arrived.

As for motive, a juror could reasonably infer defendant, after appearing by Lualemaga's car, reacted to Kuka's chasing defendant's brother and elbowing defendant hard to the ground. However, one cannot reasonably conclude this showed premeditation or planning, given the rest of Lualemaga's testimony. Lualemaga said defendant got up "fast" and ran after Kuka, shooting him multiple times in rapid succession when he caught up to him (facts that are unaffected by whether or not he stepped towards Kuka in doing so or shot him at close range).

In addition, defense expert Loftus, testifying about a hypothetical based on the incident, estimated a shooter running fast, as Lualemaga testified defendant was, caught up to the victim in about 1.3 seconds (and about 5 seconds if walking), based on the approximately 29 feet between the point of the initial collision and the location of the victim's body. The prosecution did not attempt to rebut this estimate.

Given the undisputed evidence of the events before and during the shooting, a juror could not reasonably conclude that defendant premeditated or deliberated about killing Kuka between the time he encountered Kuka and shot him. Although case law cautions that one can reach a premeditated and deliberate decision to kill quickly (*Bolin*, *supra*, 18 Cal.4th at p. 332), the particular circumstances before us indicate that a few seconds, at most, elapsed between the time defendant was elbowed to the ground and began shooting Kuka. Also, they indicate defendant was elbowed hard, knocked down, got up, chased after Kuka, and prepared to shoot him in these few seconds, significant indications defendant did not engage in any reflection or careful consideration of his actions during this short period of time. And even if the jury relied on defendant's decision to repeatedly shoot Kuka in the head after his initial shots knocked Kuka to the

74

ground, there is no evidence defendant paused in any meaningful way between his first and last shot; to the contrary, Lualemaga's testimony indicates he did not pause at all.

We are left, then, with the evidence that defendant shot Kuka nine times in rapid succession, including six shots in the head that, according to Moffatt, probably came after he shot Kuka three shots in the back and neck. Certainly, the nature of this shooting indicates defendant intended to kill Kuka. We fail to see how a juror could reasonably conclude beyond a reasonable doubt that these multiple shots, including those aimed precisely at the head, alone prove premeditation and deliberation. *Anderson* advises that such evidence, by itself, is insufficient.

We conclude there was insufficient evidence of first degree murder. The error suggested by the jury in its question to the court, and the trial court's error in rejecting defendant's motion for a new trial, was to rely entirely on the "nature of the killing" evidence, without considering whether or not there also was supporting evidence of planning or motive. We conclude no such evidence exists. To the contrary, the undisputed evidence indicates defendant shot Kuka repeatedly, without meaningful pause, a few seconds after Kuka elbowed him hard to the ground, in circumstances which can only indicate he had neither the time nor the ability to reflect on, or carefully weigh the considerations of, killing Kuka. That he fired six shots to Kuka's head is insufficient under these circumstances to establish first degree murder.

The parties agree that we have the authority to reduce defendant's murder conviction from first degree to second degree without a new trial, pursuant to sections 1181, subdivision (6)[14] and 1260.[15] We do so. Defendant argues we should reduce the

---

[14] Section 1181, subdivision 6 states: "When the verdict or finding is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed[.]" (§ 1181, subd. 6.)

[15] Section 1260 states that an appellate court "may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the

conviction further, to manslaughter, based on his claims of error discussed in this opinion and his petition for writ of habeas corpus.  We decline to do as defendant requests because his arguments of error lack merit, as we have discussed herein, and conclude we should treat his petition for writ of habeas corpus separately.

## DISPOSITION

The judgment is modified to reduce defendant's murder conviction from first degree to second degree.  The judgment is otherwise affirmed.  We remand this matter to the trial court for resentencing and modification of the abstract of judgment consistent with this opinion.


_____
Kline, P.J.


We concur:


_____
Haerle, J.


_____
Richman, J.

---

proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances."